**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **VIVIAN FARRIS; trustee for** | ) | |
| **WIRT ADAMS YERGER, JR. LEGACY** | ) | |
| **TRUST;** *Individually and on behalf of* | ) | |
| *all those similarly situated* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:17-cv-417** |
| | ) | |
| **U.S. FINANCIAL LIFE INSURANCE** | ) | **JURY TRIAL DEMANDED** |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Vivian Farris, trustee of Plaintiff Wirt Adams Yerger, Jr. Legacy Trust ("Plaintiffs"), individually and on behalf of a class and/or subclasses of all those similarly situated, brings this action against U.S. Financial Life Insurance Company and alleges based upon investigation, experience, and information and belief as follows:

### INTRODUCTION

1.      U.S. Financial Life Insurance Company ("USFL") is a for-profit life insurer organized under Ohio law.  AXA is a French multinational insurance firm headquartered in Paris, France and operating primarily in Europe, North America, the Asia Pacific region, Africa and the Middle East.  AXA is USFL's ultimate parent.

2.      USFL, AXA, and other AXA entities have engaged in a series of accounting schemes that make USFL appear as a financially strong life insurance company by utilizing captive reinsurance to offload liabilities, namely life insurance policies, and create the appearance that USFL has adequate assets to back its remaining liabilities.

1

3.      Through what New York's former Superintendent of Financial Services, Benjamin M. Lawksy, called "financial alchemy," USFL painted itself as a supremely healthy insurer, virtually bursting with excess cash, by dumping more than $865,000,000 worth of liabilities into a captive reinsurance company, AXA RE Arizona Company (formerly known as, AXA Financial (Bermuda), Ltd.) (hereafter "AXA Arizona").   AXA Arizona, however, is incapable of satisfying its assumed obligations.   To recognize the significance of that amount ceded to a captive, it needs to be put in perspective – that is **more than 8 times USFL's reported surplus of $105,000,000**.

4.      In 2007, USFL stopped selling new insurance policies and entered into a business runoff. A year later, in 2008, USFL increased Plaintiffs' and Class members' Cost of Insurance ("COI") abruptly, blaming changes in future mortality expectations.

5.      However, the 2008 COI increase was done in the midst of the Great Recession and the beginning of record-low interest rates.  This impacted the relevant policies as they have a minimum guaranteed interest rate of 4 percent and those policies were all dropped to the minimum guaranteed rate in 2008.  Despite reducing the interest rate to the minimum guaranteed rate of 4 percent, USFL now faces and continues to face interest rates on its investments that are lower than the guaranteed interest rate on the affected policies.

6.      In 2013, the North Carolina Department of Insurance notified USFL that it has been charging COI above the maximum guaranteed rate for a block of 3,000 policies, resulting in policyholders lapsing prematurely. USFL was required to reimburse both lapsed and existing policyholders within the affected policies. Beginning in 2014 and throughout 2015, tens of millions of dollars were set aside and paid out to those affected policyholders.

7.    In 2015, the same year USFL finishes paying off this costly mistake, USFL suddenly announced the increase to the COI charged to Plaintiffs' and the Class members' universal life insurance policies starting on policy anniversaries after August 31, 2015. This COI increase was as high as 40 percent for many policyholders. *See, e.g.,* "Carrier that Recently Increased Cost of Insurance Charges on In-Force Life Polices," *available at* http://lionstreet.com/media/Lion-Street-COI-Charges-Whitepaper-Carrier-List-11.07.16.pdf.

8.    Through mailers, press releases, and myriad other mediums, USFL has told policyholders that dramatic COI increases for Nova and SuperNova UL policies are necessary due to USFL "expecting future mortality experience to be less favorable than was anticipated when the current schedule of COI rates was established." *See, e.g.,* "A Close Look at the Current Universal Life Cost Increases," *available at* https://www.itm21st.com/Content/Documents/Webinar/coi-handbook.pdf; "USFL Nova & SuperNova UL Products: Increase in Cost of Insurance (COI) Rates," *available at* https://www.itm21st.com/Content/Documents/usfl-nova-supernova-ul-09-01-15.pdf.

9.    USFL has systematically raided policyholder accounts, arguing that its actions are permitted by the policies' terms since August 2015. In reality, USFL's offered justifications are false, and merely a guise to accomplish three objectives: (1) find new cash with which to fund the company, (2) rid itself of near-term liabilities, and delay inevitable financial disaster, and (3) recoup for past losses due to: (a) record-low interest rates, (b) miscalculation of the 2008 COI increase on Plaintiffs' and Class members' policies, and (c) the tens of millions of dollars paid in 2014 and 2015 to 3,000 policyholders overcharged the maximum COI rate in their respective policies.

## PARTIES

3

10.     Plaintiff Vivian Farris is an adult resident of Jackson, Mississippi.  Ms. Farris is the trustee of the Wirt Adams Yerger Jr. Legacy Trust (the "Trust") which is a family trust Wirt Yerger, Jr., formed to purchase a Nova policy ("the Policy") from USFL for the benefit of his family.

11.     Plaintiff Wirt Adams Yerger, Jr. Family Trust is a trust organized under the laws of Mississippi in Jackson, Mississippi, and for the benefit of Mr. Yerger's children and grandchildren.

12.     Defendant USFL is a corporation organized and existing under the laws of Ohio, and according to its annual statements, has its statutory headquarters at 4000 Smith Road, Suite 300, Cincinnati, Ohio 45209.

## JURISDICTION AND VENUE

13.     This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), provides federal courts original jurisdiction over any class action in which any member of a class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5 million, exclusive of interest and costs.

14.     This Court has personal jurisdiction over USFL because it is the venue where USFL resides, it has systematic and continuous contacts within the state this Court resides by and through the millions in premiums it receives from citizens of this state, the policies issued to citizens in this state, the presence of a registered agent, and its filings with the relevant state regulatory bodies.

15.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(c)(2) and (d) because USFL is subject to this Court's personal jurisdiction and has sufficient contacts

establishing such.

**FACTS**

I.      **Plaintiffs and Class Members**

16.      Mr. Yerger is a resident of Jackson, Mississippi.

17.      In order to look after his children and grandchildren he created the Wirt Adams Yerger Jr. Legacy Trust in November 2005.

18.      Mr. Yerger transferred his USFL Nova life insurance policy ("the Policy"), policy number 0000167447, to the Trust for the benefit of his family.

      **A.**      **The Yerger Policy**

19.      In March 2001, Mr. Yerger procured the Policy with a death benefit of $1,750,000.

20.      Mr. Yerger initially made a premium deposit of $297,087.

21.      On or about December 2005, Mr. Yerger changed the owner and beneficiary of the Policy to the Trust.

22.      In March 2008, USFL sent the Trust a letter stating it would increase the COI rate on the Policy because "[a] recent review of our mortality experience under this policy form has indicated that the trend in mortality and claims will be less favorable than anticipated when the product was priced." *See* Exhibit 1, March 17, 2008 USFL letter.

23.      Indeed, the COI spiked from $4,664.74 in February 15, 2008 to $5,794.46 on March 15, 2008. The yearly COI from policy year 2007-2008 was $55,182.39 and skyrocketed to $70,282.85 in policy year 2008-2009, an increase of over $15,000.

24.      Beginning in 2008, the Trust made regular premium payments to support the Policy due to the COI hike.

25. The Trust was informed in August 2015 by USFL that it would increase the COI rates on the Policy for a second time because "[w]e anticipate the future mortality experience for this product to be worse than was anticipated when the current schedule of cost of insurance rates was established." *See* Exhibit 2, August 11, 2015 USFL letter.

26. Apparently, any supposed mortality experience adjustments made during the 2008 COI increase were all for naught.

27. Instead, USFL has not experienced changes in mortality experience, but is merely recouping for prior losses based on a number of factors pleaded later in this Complaint.

28. Regardless, even if the 2008 COI increase were due to a change in mortality experience, the 2015 COI increase is merely a money grab by USFL because it either miscalculated in 2008 and is recouping for prior losses since the 2008 COI increase or USFL in continuing to hide the current COI increase under the guise of changes to "future mortality experience," changes which are extremely doubtful based on current mortality trends.

29. Indeed, the COI dramatically increased from $9,137.48 in February 15, 2016 to $17,029.35 on March 15, 2016. The yearly COI from policy year 2015-2016 was $111,693.65 and spiked to $191,217.41 in policy year 2016-2017, an increase of nearly $80,000.

30. The Policy's Account Value started in March 15, 2015, with a value of $76,142.02 and a cost of insurance of $9,078.53.

31. By June 2016, USFL warned Plaintiffs in a letter that if she did not pay an additional premium of $22,354.80 then the Policy would lapse at the end of a grace period due to the Policy Account value being depleted by the COI rate increase.

32. Mr. Yerger contacted USFL and was informed that he also needed to pay $18,000 per month in additional premiums in order to keep the Policy in force. The Trust paid an

additional premium of $95,776 after receiving another letter in December 2015 from USFL warning the policy was about to enter a grace period before lapsing. In fact, the cash value had already been drained by USFL's 2015 COI increase, as the cash value was in the negative by $6,945.99 as of December 15, 2015.

33.     Within a period of a mere ten months, USFL had completely acquired Plaintiffs' policy cash value of $76,142.02 due to the fraudulent 2015 COI increase.

34.     Plaintiffs made approximately $151,636.80 in premium payments in 2016 to keep the Policy in force – over $50,000 more in premiums than she paid in 2015.

35.     By February 15, 2017, the Policy Account was reduced to $17,913.19, and the Policy Account is expected to be at $0 unless additional premium payments are continued to be made by Plaintiffs.  The monthly COI continues to rise, and is now approximately $17,334.13 per month – nearly double the COI rate paid the previous policy year.

36.     By dramatically increasing COI charges, USFL is raiding the Policy Account, and attempting to force Plaintiffs to allow the Policy to lapse.

**B.     Class Members**

37.     Plaintiffs are not alone. USFL has dramatically increased the COI rate on policyholders of the Nova and SuperNova UL policies.

38.     The COI rate increases on these policies are drastic and unprecedented in the history of these policies. COI is being increased from 6% to 40%, depending upon the policy block.

39.     USFL is increasing the COI because it is financially unstable – a fact they have cleverly hidden through a captive reinsurance scheme – and to recoup past losses related to (a) record-low interest rates, (b) the miscalculation of the 2008 COI increase on Plaintiffs' and Class

members' policies, and (c) the tens of millions of dollars paid in 2014 and 2015 to 3,000 policyholders overcharged the maximum COI rate in their respective policies.

**II.     USFL's COI Increases Are Inappropriate Raids on Policy Cash Values**

       **A.     USFL's History**

       40.     USFL is an Ohio-incorporated insurance company with its headquarters located in Cincinnati, Ohio. The MONY Group acquired USFL on December 31, 1998, and in turn was acquired by AXA Financial, Inc. during AXA Financial, Inc.'s purchase of The MONY Group on July 8, 2004.

       41.     AXA is a French multinational insurance firm headquartered in Paris, France and operating primarily in Europe, North America, the Asia Pacific region, Africa and the Middle East.  AXA is USFL's ultimate parent.

       42.     Upon AXA Financial, Inc.'s purchase of The MONY Group (and in turn, USFL), all of USFL's term life insurance business issued since January 1, 1999 (net of non-affiliated reinsurance) was reinsured through, AXA RE Arizona Company (formerly AXA Financial Bermuda Ltd.), an affiliated company.  All policies issued effective 2005 and later earned a level allowance for the policy years and created additional capital strain upon issuance for the company.

       43.     Starting July 20, 2007, USFL entered into a runoff, i.e. terminated issuing new lines of business.

       44.     The next year, Plaintiffs and Class members received a letter dated March 17, 2008, warning, "[a] recent review of our mortality experience under this policy form has indicated that the trend in mortality and claims will be less favorable than anticipated when the product was priced."  Therefore, USFL would be increasing the COI rates on their policies – less

than a year after USFL stopped issuing new policies.

**B.      USFL's Justifications for the Nova and SuperNova UL COI Increase Are**

**False**

45.      USFL marketed and sold Nova and SuperNova UL policies during the turn of the

century.

46.      These policies chosen by USFL to receive COI rate increases ranging from 6

percent to upwards of 40 percent.

47.      With respect to the manner in which COI rates are purportedly determined, the

Policy provides:

> The cost of insurance rate is based on the Insured's sex, attained age and premium
> class. For the initial specified amount, we will use the premium class on the
> policy date. For each increase in the specified amount, we will use the premiums
> class applicable to the increase. As a result, there may be a different cost of
> insurance rate for each increase.
>
> The guaranteed maximum cost of insurance rates are shown in the Table of
> Maximum Monthly Costs on page 5. We have the right to use cost of insurance
> rates that are lower than the guaranteed rates and may change the rates from time
> to time. Any change in the cost of insurance rates will apply uniformly to all
> members of the same class.[1]

48.      As reflected in the policy language above, USFL can increase COI based solely

on reasonable assumptions regarding three enumerated factors: sex, age, and premium class.

Moreover, any COI increase must be done on a basis that will "apply uniformly to all members

of the same class."

49.      In early August 2015, USFL initially notified policyholders via correspondence

dated August 11, 2015 that effective the next policy anniversary, USFL would be increasing the

monthly COI for Nova and SuperNova UL policyholders.  The correspondence stated that the

purported basis for the COI increase was:

---

[1] Plaintiffs' USFL Policy, Exhibit 3 at 12.

9

> We anticipate the future mortality experience for this product to be worse than was anticipated when the current schedule of cost of insurance rates was established. We are writing to inform you that beginning on your next policy anniversary after August 31, 2015, the cost of insurance rates will be based on a new schedule that is higher than the current schedule.

50. AXA has repeatedly claimed in its letters to policyholders and in their 2015-2016 and 2016-2017 policy annual statements, that the alleged basis for the increase was only based on unfavorable future mortality experience. For example, in both Policy annual statements received by Plaintiffs, USFL represented "U.S. Financial Life anticipates the future mortality experience for this product to be worse than was anticipated when the current schedule of cost of insurance rates was established."

51. In reality, future mortality experience fails to support the sheer scale of the COI increase imposed upon the Policy and other Nova and SuperNova UL policyholders.

52. With respect to mortality, USFL asserts that policyholders are dying sooner than was expected when the policies were sold. However, actuarial tables published by the Society of Actuaries throughout the years, and as recently as 2014, demonstrate that mortality expectations **have consistently improved** throughout the years. This trend is even more pronounced with respect to older age insureds.

53. The COI increases range anywhere from 6 percent to 40 percent. If USFL expects this level of COI increase to return the policies to profitability, this reflects a massive investment income shortfall, which could only mean USFL's "expectations" at the issue date were inherently unreasonable, and a violation of the insurance contract.

54. Plaintiffs and Class members are now left to face the results of USFL's pillaging of their policies: a lose-lose situation. Plaintiffs and Class members are forced to watch their cash value dwindle to lapse and face paying astronomically higher premiums; go into lapse and lose

10

their death benefit and cash value if they cannot afford the draconian COI increase; or take out the dwindling cash value and attempt to obtain another life insurance policy that will lack the guaranteed interest rate and death benefit of their current policy due to the policyholder's present age and health. Truly a no-win scenario.[2]

55.     Meanwhile, USFL absconds with the cash values of Plaintiffs and Class members and reaps the benefit of premature policy lapsing due to the artificial and fraudulent 2015 COI increase.

**D.     USFL's 2015 COI Increase is Recouping Prior Losses**

56.     In fact, multiple rating agencies and industry analysts in the early 2000's criticized the life insurance industry for selling universal life policies with secondary guarantees like Plaintiffs and Class members with unreasonable expectations as to policy performance.[3] USFL refers to the secondary guarantee in Plaintiffs' and Class members' policies as a "Target Premium Guarantee Period."

57.     Beginning as early as July 2004, both Moody's and Fitch, which are industry publications, issued special reports and warnings regarding secondary guarantee universal life policies. As two industry analysts noted, "[b]oth Moody's and Fitch are now officially on record

---

[2] *See* Ron Sussman, *Commentary: Cost of Insurance Increases Keep Coming*, insurancenews.net (Oct. 14, 2016) https://www.insurancenewsnet.com/innarticle/commentary-cost-insurance-increases-keep-coming ("A common theme among the carriers that have, so far, announced these COI increases is that the insureds most affected are 70 and over.  Most of them will be unable to replace their coverage due to age, medical conditions and the cost of suitable replacement policies. . . . The actual, and possibly intended, consequence of these COI increases will be a high percentage of lapsed policies, which will surely benefit the carrier.").

[3] *See* David N. Barkhausen, *Universal Life with No Lapse Guarantees: What You Need to Know!*, (2004), http://www.lifeinsuranceadvisorsinc.com/articles/individuals/UniversalLifeNoLapse.pdf ("Recent (June and July 2004) detailed reports from Moody's, Standard & Poor's and Fitch, three of the five insurance company rating agencies, have issued strong warnings about the future impact of these policies on the companies issuing them. They caution that the premium levels for the lowest-priced products appear predicated on possible overly optimistic expectations with regard to future interest rates, mortality experience, reinsurance pricing, and policy lapse rates. Because premium levels and death benefits remain constant for the duration of a guaranteed death benefit policy, with no possible adjustments in policy pricing or benefits in the event of unfavorable future economic developments and insurer experience, these risks are greatly enhanced.").

in notifying companies that there is a new and significant factor in their evaluation of long-term financial strength."[4]

58.     Incredibly, USFL and the industry were warned that "**Moody's fears that insurers writing these policies could suffer potentially large losses if aggressive pricing assumptions involving portfolio yield, surrender rates, letter of credit (LOC) costs and mortality rates do not materialize as expected**." (emphasis original).[5]

59.     The report went on to predict that "The combination of a prolonged low interest rate environment, increasing LOC costs, higher than anticipated mortality rates, and low lapse rates can produce material losses for an insurer with a substantial block of UL policies containing these guarantees."[6] Moody's even went so far as to predict "the worse-case scenario" which is precisely what has occurred in lieu of record-low interest rates after the Great Recession:[7]

---

[4] Lawrence J. Rybka, R. Marshall Jones, *Guesses, Projections, Promises and Guarantees*, Journal of Financial Service Professionals, (July 2005); http://joneslowry.com/articles/Guesses_Projections_Promises_Guarantee.pdf.
[5] Special Comment, *Beware of What You Price For: Credit Implications of UL Secondary Guarantees for U.S. Life Insurers*, Moody's Investors Service, Report No. 87150 at 1 (July 2004).
[6] *Id*. at 2.
[7] *Id*. at 10.

The worst-case scenario for a company is to experience prolonged depressed investment returns combined with high mortality and low lapse rates.[16] As seen below, the combination of low investment yields, low lapse rates and adverse mortality has a dramatic impact on profitability.

| Scenario Descriptions | | | |
|---|---|---|---|
| Scenario | Investment Yield | Lapse Rates | Mortality as % Expected |
| The Good | 7% | 6% | 100% |
| The Bad | 5% | 4% | 150% |
| The Very, Very Ugly | 3% | 2% | 200% |



60.  Only one year later, Moody's noted that "**if interest rates continue moving on a slow upward trend**" then the life insurance industry would be favorably affected, as it "should provide insurers relief from their minimum interest rate guarantees." (emphasis original).[8] Furthermore, Moody's sounded an alarm regarding "no lapse" or secondary guarantee universal life policies, stating "We are concerned about how aggressive some companies are being with respect to their **assumption about higher interest rate levels** and about the **lack of robust analysis** by the companies **on the effects of periods of lower levels of interest rates**. If interest

---

[8] Special Comment, *2005 Credit Issues and Trends for U.S. Life & Health Insurance*, Moody's Investors Service, Report No. 93143, at 6 (Aug. 2005).

rates do not rise to the levels priced for under these product designs, the company could be subject to lower earnings or even losses." (emphasis added).[9]

61.     Simply put, "Low interest rates are a big part of this new pressure on insurers; their earnings are being squeezed."[10] For example, "If, say, an 8 percent bond from the 1990s matures, the cash must be reinvested in something new. But now, a similar bond may pay only 2 percent. The insurance policy sold to a customer back in the 1990s guaranteed a 4 percent return. It adds up to a vexing math problem: how to back a promise of 4 percent in a 2-percent-or-less world."[11]

62.     This is precisely the problem USFL faces with Plaintiffs and Class members as their policies guarantee a 4 percent interest rate on their policy cash value.  USFL lowered Plaintiffs' policy interest rate to the 4 percent floor in 2008, the same year USFL promptly increased the COI on their policy for the first time.

63.     Remarkably, USFL provided the exact same reason for increasing Plaintiffs and Class members COI rate in both 2008 and in 2015: "mortality experience."

64.     Either USFL's actuarial team greatly miscalculated the 2008 COI increase and USFL is now trying to recoup past losses from 2008 to present or, more likely, USFL is merely increasing the COI starting in 2015 in another attempt to raid the policies' cash values and force policyholders into lapse in order to minimize USFL's liabilities. Regardless, both scenarios are attempts to recoup prior losses and/or fail to have justification based on any future mortality expectations.

---

[9] *Id*. at 8.
[10] Mary Williams Walsh, *Why Some Life Insurance Premiums Are Skyrocketing*, The New York Times (Aug. 13, 2016),                https://www.nytimes.com/2016/08/14/business/why-some-life-insurance-premiums-are-skyrocketing.html?_r=1.
[11] *Id*.

65.     Furthermore, as outlined in Section II. B, mortality rates are improving and could not be the reason for the COI increases in 2008 or 2015.

66.     USFL is also desperately in need of cash due to their overcharging COI above the maximum rate for 3,000 policyholders with policies dating back to 1993.

67.     USFL was caught in August 2013 by the North Carolina Department of Insurance in charging a COI exceeding the contractual minimum rate for 3,000 policyholders. Because of this fraudulent increase and breach of contract, many policyholders lapsed or surrendered their policies. USFL reported that this excess COI remediation resulted in a cost of $14 million related to the affected policyholders.

68.     Unsurprisingly, 2015 also saw the announcement and beginning of the COI hike at issue in this Complaint.

69.     Finally, all insurance companies that are increasing COI rates have at least one thing in common: the use of captive and affiliate reinsurance companies to hide liabilities.[12] USFL is no exception as detailed further below.

70.     Moody's also predicted the problems of using captive reinsurance transactions in 2004, predicting that over the "next five to 10 years" problems would develop and could "pose significant negative credit consequences, particularly for business subject to XXX/AXXX reserves"[13] like USFL.[14]  Since 2004, Moody's has continued to monitor and criticize the life

---

[12] Walsh, *supra* n. 3. ("But in recent years, even as low interest rates ate into the industry's profits, some companies engaged in complex financial maneuvers that enabled them to pay hefty shareholder dividends. Normally, life insurers cannot pay shareholder dividends unless their balance sheets are flush. These maneuvers involve shifting a company's future obligations to policyholders into special financial vehicles that do not appear on the insurer's balance sheets."); Sussman, *supra* n. 2. ("[T]hese rate increases are being instituted to boost the return on investment on these older blocks of business. Of the carriers that have already instituted COI increases, two in particular (that we know of) have participated in complex captive reinsurance transactions that freed up significant capital that was then up-streamed as dividends to their European corporate parents.").
[13] "AXXX" reserves are for universal life insurance policies while "XXX" reserves are for term life policies.
[14] Special Comment, *Hidden Credit Risks of Regulation XXX/Guideline AXXX Reinsurance Programs*, Moody's Investors Service, Report No. 80935 at 1 (2004).

insurance industry, along with other notable commentators, regarding the use of captive reinsurance.[15]

71.     USFL's parent, AXA, and its captive reinsurance company, AXA Arizona, have both been under the eye of the federal government's Office of Financial Research.[16]

**E.     USFL Is Increasing COI Because It Is Under Reserved**

72.     The death benefits USFL will pay on the Nova and SuperNova UL policies represent a huge increase for the company, which has seen a steady increase in death benefit payments over the last several years.

73.     Because of the reinsurance scheme described below, USFL does not have sufficient reserves to pay the death benefits coming due in the near future.

74.     Faced with the unprecedented death benefit obligations, and a significant reserve shortfall, USFL chose to increase the COI charges on the Nova and SuperNova UL policies, believing that the owners of these policies either (a) had the resources to pay exorbitant COI charges, or (b) would allow their policies to lapse, thus relieving USFL of its payment obligations.

75.     Under the terms of the Nova and SuperNova UL polices with the Death Benefit Maturity Extension Endorsement, "Starting at attained age 100, the following changes will be made to this policy:" namely "No new premiums will be accepted" and "The Monthly Deduction [based upon the COI rate] will stop." *See* Ex. A at 16.

---

[15] Special Comment, *The Captive Triangle: Where Life Insurers' Reserve and Capital Requirements Disappear*, Moody's Investor Services, Report No. 156495 (Aug. 23, 2013) (analyzing AXA's captive reinsurance in Appendix III); Sector Comment, *Affiliated Certified Reinsurers: A Growing Risk for Life Industry*, Moody's Investors Service, Report No. 1028905 (Jun. 30, 2016); Sector In-Depth, *Lifting the Veil on XXX/AXXX Captives: Better Disclosure Reveals Sizable Exposures*, Moody's Investor Services, Report No. 1052633 at 15 (Jan. 20, 2017) (recognizing in Appendix 4 AXA as number 13 in the Top 20 XXX/AXXX Captive Exposures of Moody's Rated Universe).

[16] *Mind the Gaps: What Do New Disclosure Tell Us About Life Insurers' Use of Off-Balance-Sheet Captives?*, Office of Financial Research, Brief Series 16-02 at 4, 9 (Mar. 17, 2016) (analyzing AXA at Figure 5 and AXA Arizona at Figure A-2).

76.     If the owners of the Nova and SuperNova UL policies were to pay the increased COI charges until attaining age 100, they would end up paying more than the death benefits USFL is obligated to pay.

77.     As discussed above, Mr. Yerger funded the Policy initially with a $297,087 payment and has subsequently made regular premium payments since 2009.  The 2015 increased COI charges require the Trust to pay over $17,000 a month, or over $204,000 annually.

78.     If Mr. Yerger lives to age 100, the Trust would end up paying total premiums and cost of insurance monthly deductions in excess of the $1,750,000 death benefit.

**III.     General Background Allegations Regarding Reinsurance Scheme**

79.     Life insurance policies are unique financial obligations: long-term commitments where the life insurer promises to be a faithful steward of policyholders' money and to give a sum-certain to policyholders' loved-ones after their death.

80.     To induce people to enter into these decades-long agreements, life insurers tout their longevity, long-standing commitment to policyholders and their families, and their financial strength.  For example, AXA's website markets prominently the organization's roots beginning as early as 1859, to encourage the public to purchase its policies.  *See* https://us.axa.com/about-axa/ ("A history of dependability").

81.     Because life insurance companies promise to pay death benefits far into the future, a company's financial condition is particularly important to potential purchasers.  Life insurers understand this and market themselves as financially strong and prudent. For example, USFL's website, in part, brags about both AXA's and USFL's financial strength and reads: "In addition, Fitch Ratings has affirmed an Insurer Financial Strength rating of "AA" for the major insurance entities of AXA Group, which includes U.S. Financial Life Insurance. The long-term

and short-term ratings of AXA Group are also affirmed at 'A+' and 'F1' respectively. The Outlooks on the ratings remain Stable." *See* http://www.usfli.com/c_about.html.

82.     The National Association of Insurance Commissioners (the "NAIC") also specifically acknowledges that a company's financial condition is an essential tool used to protect policyholders. NAIC Statement of Statutory Accounting Principles (the "SSAP"), Preamble, ¶ 27 ("The ability to effectively determine financial condition using financial statements is of paramount importance to the protection of policy holders.").

83.     So too is a life insurer's accounting information acknowledged as a factor consumers use to determine which entity they will trust with their money. *Id*. at Preamble at ¶ 6 ("Customers . . . may use accounting information to make choices as to the entity with which they engage in a business transaction.").

84.     The SSAP governs the way in which financial information is accumulated and reported to users. *Id.*, Preamble, ¶ 6.

A.     **SSAP Is Designed to Protect Policyholders and Requires Accurate Financial Condition Disclosure**

85.     NAIC is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from each of the 50 states, the District of Columbia, and five U.S. territories. One of NAIC's goals is to "[p]rotect the public interest" and to "[p]romote the reliability, solvency and financial solidity of insurance institutions." "Our Mission," About the NAIC, *available at* http://www.naic.org/index_about.htm.

86.     The SSAP is found in the NAIC Accounting Practices and Procedures Manual ("AP&P Manual"). The SSAP's objectives are specifically spelled out:

> The conceptual framework used in developing and maintaining statutory accounting principles for insurance companies is summarized in the Statutory Accounting Principles Statement of Concepts. The application of ***conservatism,***

*consistency and recognition* assure that guidance developed and codified as part of this project is consistent with the underlying objectives of statutory accounting.

(emphasis added).

87.    The SSAP Preamble: Conclusion, further states:

Application of [SSAP], either contained in the [Statements on Standards for Accounting and Review Services] SSARs or defined as GAAP and adopted by NAIC, to unique circumstances or individual transactions should be consistent with the concepts of *conservatism, consistency, and recognition*.

(emphasis added).

88.    The SSAP differs from other financial accounting methods because the focus is on solvency for the protection of policyholders.

89.    To protect policyholders, the applicable statutory accounting principles promote conservativism: "Conservative valuation procedures provide protection to policyholders against adverse fluctuations in financial condition or operating results.  Statutory accounting should be reasonably conservative over the span of economic cycles and in recognition of the primary responsibility to regulate for financial solvency."  AP&P Manual, ¶ 30.  This emphasis— determining an insurer's ability to satisfy obligations years in the future—is much different than other financial accounting methods, such as Generally Accepted Accounting Principles ("GAAP").

90.    The NAIC requires all fifty states to adopt the AP&P Manual and Annual Statement Instructions, and all fifty states have in fact adopted them.

91.    Codified by every state, the SSAP "provide examiners and analysts with uniform accounting rules against which companies' financial statements can be evaluated," thereby providing "more complete disclosures and more comparable financial statements," in which surplus and RBC "will be reported more consistently . . . ." SSAP Preamble, ¶ 14.

92.     To that end, Ohio, USFL's state of domicile, and all other states, require all Annual Statements conform to the annual statement instructions and manuals promulgated by NAIC.

93.     Therefore, every year USFL is required to prepare and file a sworn Annual Statement, based on the convention blank form adopted by NAIC, that accurately reports its financial condition with the Ohio Department of Insurance.

94.     An Annual Statement is a detailed statement of an insurance company's finances. It must be prepared according to SSAP, to the extent they are not in conflict with applicable state statutes or regulations. Quarterly Statements, which contain less detail than the Annual Statement, are also prepared using the same accounting methodology.

95.     States can by law, regulation, or rule specifically require accounting practices (which may differ from NAIC SSAP), or they can permit accounting practices that differ from SSAP, however, both the deviation and its financial effect must be specifically disclosed in an insurance company's Annual Statement.  SSAP No. 1.  While "[s]tatutory requirements vary from state to state ... to the extent that they exist it is the objective of NAIC statutory accounting principles to provide the standard against which the expectations will be measured and disclosed if material."  Statement of Concepts, ¶ 26.

96.     Therefore, if an insurer's use of a state accounting practice departs from SSAP, and the deviation affects its surplus or Risk Based Capital ratio ("RBC ratio"), the insurer must disclose both the accounting practice and explain the financial impact to the insurance company in Note 1 of its Annual Statement:

> [I]f a reporting entity employs accounting practices that depart from the NAIC accounting practices and procedures, disclosure of the following information about those accounting practices that affect statutory surplus or risk-based capital shall be made at the date each financial statement is presented:

(a) A description of the accounting practice;

(b) A statement that the accounting practice differs from NAIC statutory accounting practices and procedures;

(c) The monetary effect on net income and statutory surplus of using an accounting practice which differs from NAIC statutory accounting practices and procedures;

(d) If the insurance enterprise's risk-based capital would have triggered a regulatory event had it not used a prescribed or permitted practice, that fact should be disclosed in the financial statements.

SSAP No. 1.

97.     Essential to SSAP principles, and inherent in all of its requirements, is the concept

of *adequate disclosure*:

Statutory reporting applies to all insurers authorized to do business in the United States and its territories, and *requires sufficient information to meet the statutory objectives.* However, statutory reporting as contained in this guide is not intended to preempt state legislative and regulatory authority. The SSAP financial statements include the balance sheet and related summary of operations, changes in capital and surplus, and cash flow statements. Because these basic financial statements cannot be expected to provide all the information necessary to evaluate an entity's short-term and long-term stability, *management must supplement the financial statements with sufficient disclosures* (e.g., notes to the financial statements, management's discussion and analysis, and supplementary schedules and exhibits) to assist financial statement users in evaluating the information provided.

SSAP Preamble: Objectives of Statutory Financial Reporting (emphasis added).

98.     Consistent with these objectives, life insurance companies must fully and accurately disclose the nature of their financial transactions.  If they do not, regulators, rating agencies, and policyholders will not have sufficient information with which to accurately evaluate the insurance companies' ability to satisfy policy obligations.

99.     Accurate Annual Statement reporting is critically important because it is one of the few publicly available financial disclosure documents.  Consumers, agents, ratings agencies,

and others rely on the Annual Statements to assess companies' financial strength and ability to pay future claims as they come due.  In short, Annual Statements are essential for the ultimate customer—the policyholder—to evaluate whether to put his or her trust in the insurance company.

100.    An insurance company's Annual Statement, statutory surplus, and RBC ratios are also the key variables A.M. Best, a rating agency that focuses on the insurance industry, uses to evaluate life insurers' financial strength.

101.    For example, A.M. Best issues financial strength ratings that provide opinions about an insurer's financial strength and ability to meet its ongoing obligations to policyholders. Among other things, the financial strength rating is based on an insurance company's reported surplus and RBC ratio because this data is "the foundation for policyholder security." A.M. Best Methodology, Criteria – Insurance, May 2, 2012, at page 1.

102.    According to A.M. Best, financial strength ratings are important "to assess the creditworthiness of an insurer's operations, to evaluate prospective reinsurance accounts, to compare company performance and financial condition."  Moreover, a "rating can influence an agent's selection of plans to market."  *Id*.  Likewise, "[a] rating also is an important factor in the consumer's decision-making process to purchase insurance," and it "can provide consumers with the information necessary for an educated buying decision."  *Id*.

**B.      Surplus and RBC Are The Two Main Ways Insurance Companies Are Measured for The Ability to Meet Long-Term Obligations**

103.    The two primary metrics used to measure whether an insurance company is adequately capitalized to meet future obligations are surplus and RBC.  Both metrics reflect life insurance's conservative nature.

         i.      ***Surplus as a measure of solvency.***

104.     An insurance company's solvency is critical to policyholders.  It "ensure[s] that the policyholder, contract holder and other legal obligations are met when they come due and *that the companies maintain capital and surplus at all times and in such forms as required by statute to provide an adequate margin of safety*."  SSAP Preamble, ¶ 27 (emphasis added).

105.     The consumer can only assess an insurance company's ability "to provide an adequate margin of safety" if the life insurance company accurately discloses its financial condition because "the cornerstone of solvency measurement is financial reporting."  *Id.*

106.     Surplus is the company's *admitted assets* minus its liabilities, including its current and projected future policyholders' obligations.

107.     *Admitted assets* are an insurer's assets that are available to satisfy the obligations owed to policyholders.  Assets that cannot be readily liquidated due to encumbrances or other third party interests cannot be reported as *admitted assets*.  SSAP No. 4.

108.     A contingent letter of credit is an example of an asset that cannot be an admitted asset.

109.     The following example of a simplified balance sheet demonstrates how surplus is calculated:

| Admitted Assets | | Liabilities | |
|---|---|---|---|
| Bonds | $13 Billion | All Reserves | $14 Billion |
| Stock | $ 1 Billion | Expenses Due | $2 Billion |
| Cash | $ 1 Billion | Debt | $0 |

| | | | | |
|---|---|---|---|---|
| | | | | |
| All Other | $2 Billion | | | |
| **Total Admitted Assets** | **$17 Billion** | | **Total Liabilities** | **$16 Billion** |
| | | | | |
| | **Surplus = $1 Billion** | | | |

110.    If a life insurance company's statutory surplus falls below the minimum legal levels, or if the company operates at an annual loss, it is not permitted to pay dividends to shareholders and may not be able to continue operations.

111.    Management of every U.S.-based life insurer swears, under penalty of perjury, that the financial condition of their company, as reported in the Annual Statements, is completely true.  That means that assets must be valued truthfully, and liabilities calculated in accordance with the law, specifically SSAP.

112.    State laws and SSAP requirements create a framework by which an insurer's financial condition is externally reported to, among others, consumers.

113.    For a life insurer, liabilities are almost entirely promises made to policyholders— such as death benefits—and those promises are most often very long-term commitments.  The nature of insurance business requires insurance company management engage actuaries to calculate the total commitments associated with a company's annuities and life policies for the Annual Statement.  To account for future events that would trigger claims the company is bound

to pay under the policies, actuaries must calculate the present value of all of those future promises.

114.    The projected amount due under life insurance policies is a very static figure because the calculation is relatively stable and predictable due to long-term trends, involving far fewer unknowns than property and casualty risks, which would include such events as hurricanes and fires.

115.    The actuary performs mathematical calculations to determine the present value of future liability, which is the liability figure used on a life insurer's balance sheet.  If the value of the admitted assets exceeds that liability figure, the company enjoys surplus.  If, however, admitted assets are insufficient to cover the liability figure, the company suffers from a deficit and the state regulator must take action to protect policyholders by, for example, putting the company in receivership.

116.    Accurate reporting of assets and liabilities is necessary to measure a life insurer's solvency—as measured through surplus—and rating agencies, regulators, and consumers rely on companies to fulfill their obligation to report their true financial condition.

   ii.    *RBC as a measure of ability to meet future obligations.*

117.    RBC is another measure of insurance company solvency and is one of the most important factors examined in determining an insurance company's ability to meet future obligations.

118.    RBC is a ratio used to limit the risk a company can acquire.  RBC requires a company that has greater risk to hold more capital, thereby giving the company a cushion against insolvency.  Stated another way, RBC is a ratio that ensures a company can meet its future obligations.

119. To assure policyholders that the benefits they purchased are available when needed, NAIC began regulating insurer capital through the Risk-Based Capital Model Act ("the RBC Model Act.").

120. The RBC Model Act provides a method of measuring the minimum capital necessary for an insurer to support its overall business operations when considering its size and risk profile.

121. Under the RBC Model Act, insurance companies calculate and self-report their total adjusted capital (in general, the amount by which a company's assets exceed liabilities) and an RBC figure which reflects the riskiness of the company's activities. Although the insurance company reports the results of those calculations on its Annual Statement, the calculations themselves are not part of the Annual Statement.

122. RBC is intended to be a *minimum* capital standard, and is not necessarily a measure of the total capital an insurer would want to meet its safety and competitive objectives. Additionally, RBC is not designed as a stand-alone tool to determine financial solvency of an insurance company; rather it is one of the tools used to assess the ability of insurance companies to meet its risk obligations both now and in the future.

123. Before RBC was created, fixed capital standards were a primary tool used to monitor insurance companies' financial solvency.  Under fixed capital standards, insurers were required to supply the same minimum amount of capital, regardless of the financial condition of the company.  Capital requirements varied by state, ranged from $500,000 to $6 Million, and were dependent upon the state and the lines of business the insurance carrier wrote.  Companies were required to meet minimum capital and surplus requirements to be licensed and to write business in the state.  As insurance companies changed and grew, it became clear that the fixed

capital standards were no longer effective in providing a sufficient cushion for many insurers.

124.    Following a string of large company insolvencies in the late 1980s and 1990s, the NAIC implemented its RBC regime, intending it to be an early warning system that alerted regulators to potential insolvencies.

125.    The RBC regime's intent was to provide a capital adequacy standard directly related to risk that (a) provided a safety net for insurers, (b) was uniform among the states, and (c) provided regulatory authority for timely action.

126.    The NAIC RBC regime has two main components: (1) the risk-based capital formula, that established a hypothetical *minimum* capital level that is compared to a company's actual capital level, and (2) a risk-based capital model law that gives state insurance regulators authority to take specific actions based on the level of impairment if an insurer's RBC drops below the minimum threshold.

127.    Under the RBC system, regulators have statutory authority to take preventive and corrective measures, which vary depending on the capital deficiency indicated by the RBC result.  These preventive and corrective measures are intended to enable regulatory intervention that will correct problems before insolvencies become inevitable, thereby minimizing the number and adverse impact of insolvencies.

128.    On their Annual Statements, insurance companies must report two RBC-related numbers: (1) Total Adjusted Capital, and (2) their Authorized Control Level Capital.

129.    Frequently, the comparison between a company's Total Adjusted Capital and the Authorized Control Level Capital is expressed as a ratio—the RBC Ratio.  The ratio is:

$$\frac{Total\ Adjusted\ Capital}{Capital\ Reserved\ In\ Accordance\ Pursuant\ to\ RBC\ Model\ Act}$$

130.    When the NAIC RBC system is tripped, one of two things happens: (1) a

company must take action to increase its capital as compared to its risk (meaning increase its surplus), or (2) regulators can exercise their statutory authority and intervene in the business affairs of the insurer. If a company's financial reporting is accurate, reported RBC alerts regulators to undercapitalized companies, giving them sufficient time to act and minimize overall costs associated with insolvency.

131. The RBC ratio is also used by consumers to evaluate the likelihood an insurer will become insolvent given its capital, surplus, and liabilities because it is a significant factor rating agencies use to measure a company's financial strength.

132. If RBC is misstated, a company not only improperly avoids regulatory intervention, but it also misleads ratings agencies and consumers about its financial stability and the sufficiency of its capitalization.

**C.     Transactions with Affiliates Can Manipulate Surplus and RBC.**

133. "An 'affiliate' . . . is a [company] that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the [company] specified." Insurance Holding Company System Regulatory Act §1A.

134. Historically, companies have used affiliated entities to hide their distressed financial condition, á la Enron. Accounting machinations and off-balance sheet liability transfers are easily executed when the company that assumes liabilities is wholly owned or affiliated with the ceding company, and has every incentive to act for a common benefit, rather than its own benefit.

135. Surplus and RBC are good predictors of an insurer's solvency only if all the company's transactions regarding the transfer of liabilities, assets, and risk are legitimate and arm's-length. When, however, such transactions are not arm's-length, surplus and RBC can be

easily manipulated.

136. Obviously, some affiliated transactions achieve meaningful purposes, for example, consolidating certain lines of business into an affiliate that specializes in that line. Affiliated transactions, however, can also be used for nefarious purposes, such as shuffling liabilities between entities, artificially "transferring" risk, inflating valueless assets, or merely generating phantom assets.

137. Insurance companies legitimately use reinsurance, coinsurance, and modified coinsurance transactions to spread risk to third-party companies that are solvent and capable of meeting policyholder obligations. This allows insurance companies to obtain surplus relief, as well as improve their risk-based capital ratios.

138. When an insurer "cedes" risks of a block of life insurance policies or annuities through a bona fide reinsurance transaction, the assuming company is obliged by the governing reinsurance contract—a "treaty"—to set up reserve liabilities for that block. Once ceded, the ceding company can drop those liabilities from its own financial statements because the assuming company becomes responsible for paying those liabilities.

139. By way of example, assume that Company A originally sold 100 insurance policies to customers (policyholders), each with a death benefit of $100,000. Although extremely unlikely, the worst-case scenario for the insurer is that all 100 policyholders suddenly die the very next day. Doing the math, a $100,000 death benefit multiplied by 100 policies equals a $10 Million liability. However, it is virtually impossible that all 100 policyholders will die after just one day. Applying mathematical tables, formulas, and the "Law of Large Numbers," actuaries can predict with remarkable accuracy when an insured, within a given band, will die. Accordingly, Company A is not required to hold reserves equal to a policy's ultimate

death benefit. However, between the policy's issue date and the policyholder's death, the insurance company is expected to collect premiums and earn interest on those funds which will, over time, equal more than the $100,000 benefit. For this reason, the initial reserve liability for a very young, healthy, non-smoker will be much lower than it would be for an elderly smoker. This assessment, keyed to the present value of the obligation, is done through annual cash flow testing and reserve calculations.

140.    In insurance parlance, the total needed to fulfill all contractual obligations (in this example $10 Million) is referred to as the "Gross In-Force"—the sum of all ultimate death benefit payments. Because it is extremely likely that the deaths will be staggered across many ensuing years, the insurance company only needs to hold in reserve the present value of that ultimate $10 Million. For this example, assume that the actuarially required immediate reserve liability is $1 Million for the entire block.

141.    When Company A cedes this block of policies to Company B in a reinsurance transaction, Company A drops the present value amount of $1 Million from its liabilities and Company B sets up the $1 Million liability on its books. Company B is essentially standing in Company A's shoes, and must pay Company A $100,000 for each death claim as it is made. The terminology used to describe Company A's reduction of the $1 Million liability is a "reserve credit." In other words, because Company B is now "on the hook" to pay the claims as they come due, Company A is allowed to reduce its reserve liability (called a "reserve credit") by $1 Million. In this way, Company A reduces its liabilities by $1 Million and Company B adds $1 Million to its liabilities.

142.    Because this is a business transaction between two independent companies, Company B will not acquire the reserve liabilities without sufficient payment; therefore,

Company A must also send sufficient assets to cover the reserve liabilities.  In an arm's-length transaction, those assets are cash or cash-equivalents that have sufficient face value to cover the assuming company's obligations.

143.    RBC assumes that all reinsurance agreements are reached at arm's-length with reinsurers financially capable of performing the ceded reinsurance obligations; therefore, the RBC formulas do not account for reinsurance *quality*.  As a result, reinsurance with a highly solvent third-party reinsurer and reinsurance with an undercapitalized wholly owned captive shell company are treated the same.

144.    Coinsurance or modified coinsurance similarly spreads risk.  However, the assets and liabilities for the block of business that is coinsured stay on the balance sheet of the ceding company for surplus calculation purposes, but are considered transferred to the assuming company for RBC purposes.  In other words, the ceding company's RBC is calculated as if the company had transferred that block of business off its books.

145.    Historically, insurance companies reinsure or coinsure their risks with highly capitalized and independent—non-affiliated—companies.  Legitimate reinsurers are used for their strong financial support and their valuable expertise and advice.  A knowledgeable, well-capitalized, and honest reinsurer helps a company spread its risks and shares knowledge of good underwriting practices and economic expectations.  The independent reinsurer has its own set of experienced executives, actuaries, and other experts that help the ceding company achieve shared goals.  With well-capitalized and independent reinsurers, the valid purpose for reinsuring or coinsuring risks is achieved.

146.    In arm's-length transactions between unaffiliated entities, both companies are independently incentivized to ensure that liabilities transferred mirror liabilities assumed, and

that the transferred assets are real and sufficient to cover the assumed liabilities.

147.    In fact, for the ceding company to enjoy a reserve credit, the reinsurance agreements must transfer risk from the ceding entity to the reinsurer.  SSAP 61R, ¶ 17.

148.    When insurance companies engage in reinsurance, coinsurance, and modified coinsurance transactions with affiliated entities, the companies can manipulate their balance sheets or risk profiles.  Such transactions can foist large liabilities or risky assets onto an affiliated entity that is not subject to the strict capital and surplus requirements imposed on life insurance companies for the policyholders' benefit.

149.    Such transactions between affiliates, especially shell entities, often have no valid economic purpose.  Indeed, pretending to transfer risk to an affiliate or captive is similar to a husband handing off a debt he owes a bank to his wife, purportedly to improve the family's financial condition.  It simply does nothing.

150.    These types of sham liability transfers have recently become prevalent in the life insurance industry: insurance companies create, and enter into transactions with, wholly owned captive subsidiaries whose finances are secret and free from regulatory scrutiny.  These entities provide a vehicle for financial alchemy that serves to mask a ceding company's dire financial condition, or even insolvency.  *See, e.g.,* Jill Cetina, et al., <u>Mind the Gaps: What Do New Disclosures Tell Us About Life Insurers' Use of Off-Balance-Sheet Captives</u>, Office of Financial Research,          March          17,          2016,          *available*          *at* https://www.financialresearch.gov/briefs/files/OFRbr_2016-02_Captive-Insurers.pdf.

**D.    The Danger of Financial Alchemy Through Transactions with Affiliates Worsens Through the Use of Wholly Owned Captives**

151.    A legitimate captive insurance company is a very specific kind of risk financing wherein a non-insurance company, such as Exxon, creates an insurance subsidiary for which it is

the sole policyholder.  The captive insurer is a regulated entity designed to provide a form of self-insurance.  Through a captive reinsurer, a company creates a self-insurance vehicle and tax deductions because it can write off the premiums.  Companies typically form captives when they are either so large that they have more resources than the insurers who would be covering their risk, or when it is simply less expensive to start and run one's own insurance company than it is to pay the market value for certain kinds of insurance.

152.    A captive insurer is "an insurance or reinsurance entity created and owned, directly or indirectly, by one or more industrial, commercial or financial entities, other than an insurance or reinsurance group entity, the purpose of which is to provide insurance or reinsurance cover for risks of the entity or entities to which it belongs, or for entities connected to those entities and only a small part if any of its risk exposure is related to providing insurance or reinsurance to other parties."  International Association of Insurance Supervisors, Issues Paper on the Regulation and Supervision of Captive Insurance Companies, October 2006, *available at* www.captiveglobal.com/files/documents/Issues_paper_on_regulation_and_supervision_of_capti ve_insurance_companies_October_2006.pdf.

153.    Nevertheless, insurance companies have begun to create "captive" reinsurance subsidiaries primarily to hide liabilities, thereby falsely inflating RBC.

154.    Arguably, the impetus for captive reinsurance subsidiaries was the NAIC's Regulation XXX reserving methodology.  The XXX reserving methodology is the product of the NAIC's March 1999 adoption of the revised Valuation of Life Insurance Policies Model Regulation.

155.    Becoming effective in January 2000, Regulation XXX significantly increased the U.S. statutory reserve requirements for term life insurance writers.

33

156.    Regulation XXX was a response to life insurer's attempt to drive down reserves by creating products that had excessively late-duration guaranteed premiums.  Regulation XXX was intended to foreclose this practice, which was generally regarded as a loophole exploitation.  Regulation XXX addressed this practice by necessitating that each level of a premium be calculated separately in order to ensure sufficient reserve requirements.

157.    The insurance industry pushed back against increased reserves requirements imposed by Regulation XXX.  Insurance companies alleged that the reserve requirements were overly stringent and, in response, began pursuing workarounds.

158.    Ultimately, companies began to evade the increased reserve requirements by using captive reinsurers.  More specifically, many companies began ceding their policy liabilities to offshore or out-of-state reinsurers where local statutory reserving requirements were less onerous, such as allowing the use of U.S. GAAP rather than SSAP.

159.    Universal life ("UL") policies with secondary guarantees are subject to Regulation AXXX (also known as Actuarial Guideline 38).  Reserves under AXXX demonstrate a similar "hump-backed" pattern as XXX with longer tails since universal life typically has a longer average policy life than term life products.  The reinsurance market for the AXXX reserve is very limited and most insurers retain the risk.

160.    To address the looming capital needs associated with XXX and AXXX reserves, many for-profit life insurance companies turned to so called "alternate capital-funding solutions," among which securitization is considered the more elegant solution.

161.    Securitization is the process of repackaging certain assets or cash flows for sale in the capital markets as debt securities that pay periodic coupons as well as the eventual repayment

of principal.  Investors buying these securities will assume the risks inherent in the underlying cash flow.

162.    A common and well-known type of securitization in the asset world is a mortgage-backed security ("MBS"), where the cash flows from a pool of mortgages are sold as debt.  Insurance securitizations follow a very similar process, except that the cash flows are derived from liabilities instead of assets, and the risks are related to insurance risks such as mortality and lapse rates instead of prepayment.

163.    A simple hypothetical illuminates how these securitizations function in practice: suppose a block of term insurance reserves under XXX is being securitized.  Similar concepts would apply to UL reserves under AXXX as well.  The original company is either a direct writer or a reinsurer looking to finance its mounting XXX reserve.  The company typically would set up a captive reinsurer and cede off its block of term policies under a coinsurance treaty.  Many companies choose to set up captives either offshore or in states that offer favorable regulatory accounting treatment, such as allowing the use of GAAP reserves for the captive's regulatory reporting.  A holding company may be set up as the parent to the captive reinsurer.  Many prefer this type of holding company structure, since the original company does not directly own the captive reinsurer, and it is less likely that the original company will need to reflect the captive reinsurer on its statutory financial statement.

164.    Special Purpose Vehicles ("SPVs") are often used in securitization.  An SPV is set up to serve a specific purpose, such as raising capital and servicing investors in a securitization.  It performs little or no other activities.  The investors have claims to assets only in the SPV and have no recourse to the original company.  Similarly, the creditors of the original company have no claims to any assets in the SPV.  The equity holder of the SPV is often the

original company, an affiliate or an investment bank, and controls the SPV's activities, including the issuing of debt or equity securities, as well as selling notes to the investors. The SPV pays the financial guarantor a premium to compensate for the risks the guarantor assumes.

165.    For years, insurance companies like USFL's parent company, AXA, created these captive entities in offshore countries, such as Bermuda. Because the offshore captives are not subject to U.S. regulation, they provide a means to hide balance sheet and RBC problems from United States regulators.

166.    In the last decade, several states, including Arizona, encouraged the formation of the "special purpose financial captives" ("SPFCs")—a specific type of SVP—in their states, hoping to spur a cottage industry that would generate fee revenues and create jobs. Such state programs feature confidentiality protections that, despite the required transparency of the ceding company's financial condition, shield the SPFCs' financial condition from the view of consumers (and even from other state regulators that would be unwilling to offer SPFCs the same degree of secrecy).

167.    Arizona, for example, clothes domestic SPFCs in secrecy, only permitting its Commissioner of the Department of Insurance to disclose captive formation and financial information to non-governmental entities under discreet circumstances, for example, in response to a subpoena, but only if certain specific requirements are met. *See* AZ. STAT. ANN. § 20-1098.23(3).

168.    The same strict confidentiality restrictions apply to examinations and investigations by the commissioner into a captive insurance company's financial condition:

> Section 20-1098.23 [confidentiality provisions] applies to all examination reports, preliminary examination reports or results, working papers, recorded information, documents and copies of any of those reports, results, papers, information or

documents produced by, obtained by or disclosed to the director in the course of an examination made under this section.

*Id.* at § 20-1098.08(B).

169.    In short, Arizona and certain other states now allow insurance companies to create U.S. subsidiaries whose balance sheets are secret.  This is precisely why USFL's parent company, AXA, transferred AXA Arizona (formerly known as, AXA Financial (Bermuda), Ltd.) from Bermuda to Arizona.

170.    Simply stated, AXA and USFL can shuttle financial statement problems onto captive SPFCs, like AXA Arizona, and away from regulation and public scrutiny.

171.    For this reason, many people consider captive SPFCs the "black hole" of insurance company financial analysis.

172.    As captives have become more prevalent, the NAIC has begun to examine and advise the insurance industry on their potential abuse.  In fact, the NAIC has expressly stated that these entities should not be used to manipulate company finances: "Commercial insurer-owned captives and [SPFCs] ***should not be used to avoid statutory accounting***."  NAIC, The Captive and Special Purpose Vehicles: An NAIC White Paper (hereinafter "NAIC White Paper"), at 3 (emphasis added); *see also id.* at 20 ("the general opinion of the Subgroup was that it is inappropriate for captives and [SPFCs] to be used as a means to avoid statutory accounting."); *id.* at 23 (recognizing "a consensus view that captives and special purpose vehicles should not be used by commercial insurers to avoid statutory accounting prescribed by states."); *id.* at 30 ("The practice of using a different entity or different structure outside of the commercial insurer to engage in a particular activity because of a perception that the regulatory framework does not accurately account for such activity should be discouraged. The Subgroup held a consensus view that captives and [SPFCs] should not be used by commercial insurers to avoid statutory

accounting prescribed by the states.").

173.    The NAIC White Paper also stated that conditional letters of credit ("LOC"), which cannot be admitted assets pursuant to SSAP, were not appropriate means for capitalizing captive SPFCs:

> The transactions involving conditional LOCs or parental guarantees effectively permit assets to support reinsurance recoverables, either as collateral or as capital, in forms that are otherwise inconsistent with requirements under Model #785 and Model #786 or other financial solvency requirements applicable to U.S.-domiciled commercial assuming insurers. The Subgroup held a consensus view that these types of transactions may not be consistent with the NAIC credit for reinsurance requirements.

NAIC White Paper, at 23.

174.    The draft White Paper was more blunt:

> The transactions involving conditional LOCs or parental guarantees effectively permit assets to support reinsurance recoverables, either as collateral or as capital, in forms that are otherwise inconsistent with requirements under the credit for reinsurance models or other financial solvency requirements applicable to U.S.-domiciled commercial assuming insurers.  The subgroup held a consensus view that these types of transactions were not consistent with the NAIC credit for reinsurance requirements.  ***It is not financially sound to provide credit for reinsurance when the assuming insurer's solvency depends on a parental guaranty, while the parent's surplus that supports that guaranty includes credit for the very reinsurance whose performance depends on the guaranty. Similar bootstrapping problems arise if reinsurance is directly secured by an LOC, or is indirectly secured when an LOC is used to capitalize the assuming insurer, and the ceding insurer itself, or one of its affiliates, is the LOC applicant, which becomes liable to reimburse the bank if the LOC is drawn.***

Draft White Paper (setting out Maine comments), at 18 (emphasis added).

175.    In short, an otherwise regulated commercial insurer, like USFL, cannot do through an SPFC what it is prohibited from doing by SSAP.  Liabilities originating with, and retained by, the ceding insurer cannot be granted favorable treatment merely by reporting that those liabilities are on the books of an affiliated captive.  *See, e.g.*, NAIC White Paper, at 28

("allowing a captive or [SPFC] to account for LOCs or parental guarantees as assets [is] something not permitted in the current statutory accounting framework."). Likewise, risky assets that would normally affect a company's RBC ratio cannot simply be transferred to a wholly owned captive entity to make the insurance company look financially stable when it is not.

176.    As alleged with particularity below, and precisely as feared by the NAIC, USFL has used SPFCs and other affiliated entities to facilitate a fraudulent scheme to avoid statutory accounting rules and principles to make USFL appear financially stable and inflate statutory surplus, and magically improve its RBC ratios. As shown below, USFL used the "black box" confidentiality afforded by Arizona to evade SSAP principles, to misstate its true surplus, and mask its troubled financial condition to regulators, rating agencies, and ultimately, its life insurance customers.

### E.    Rules Prohibiting Financial Alchemy Through Affiliated Transactions

177.    Because the risk that insurance companies will alter their balance sheet through affiliate transactions is so grave, the NAIC drafted the Model Holding Company Act, adopted in all 50 states, to govern such transactions. The Act's primary objective is to ensure that insurance companies' transactions with affiliates are "fair and reasonable," and done at "arm's-length."

178.    Those requirements, mainly contained in SSAP 25, prohibit companies from recording non-arm's-length or non-economic transactions with affiliates in such a way that they seem to "create" assets, falsely inflate assets, or mask liabilities.

179.    SSAP No. 25 governs accounting for transactions with affiliates and other related parties. SSAP No. 25 in pertinent part provides:

[1] Related party transactions are subject to abuse because reporting entities may be induced to enter transactions that may not reflect economic realities or may not be fair and reasonable to the reporting entity or its policyholders. As such, related party transactions require specialized accounting rules and increased regulatory

scrutiny. This statement establishes statutory accounting principles and disclosure requirements for related party transactions.

\*\*\*

[9] Loans or advances by a reporting entity to all other related parties shall be evaluated by management and nonadmitted if they do not constitute arm's length transactions as defined in paragraph 12.

\*\*\*

[12] An arm's-length transaction is defined as a transaction in which willing parties, each being reasonably aware of all relevant facts and neither under compulsion to buy, sell, or loan, would be willing to participate. A transaction between related parties involving the exchange of assets or liabilities shall be designated as either an economic transaction or non-economic transaction. An economic transaction is defined as an arm's-length transaction which results in the transfer of the risks and rewards of ownership and represents a consummated act thereof, i.e., "permanence." The appearance of permanence is also an important criterion in assessing the economic substance of a transaction. In order for a transaction to have economic substance and thus warrant revenue (loss) recognition, it must appear unlikely to be reversed. If subsequent events or transactions reverse the effect of an earlier transaction prior to the issuance of the financial statements, the reversal shall be considered in determining whether economic substance existed in the case of the original transaction.

\*\*\*

An economic transaction must represent a bona fide business purpose demonstrable in measurable terms. *A transaction which results in the mere inflation of surplus without any other demonstrable and measurable betterment is not an economic transaction. The statutory accounting shall follow the substance, not the form of the transaction.*

\*\*\*

[13] In determining whether there has been a transfer of the risks and rewards of ownership in the transfer of assets or liabilities between related parties, the following – and any other relevant facts and circumstances related to the transaction – shall be considered:

[a] Whether the seller has a continuing involvement in the transaction or in the financial interest transferred, such as through the exercise of managerial authority to a degree usually associated with ownership;

\*\*\*

[15] A non-economic transaction is defined as any transaction that does not meet the criteria of an economic transaction. Similar to the situation described in paragraph 13, *transfers of assets from a parent reporting entity to a subsidiary, controlled or affiliated entity shall be treated as a non-economic transactions at the parent reporting level because the parent has continuing indirect involvement in the assets*.

\*\*\*

[16] When accounting for a specific transaction, reporting entities shall use the following valuation method:

[a] Economic transactions between related parties shall be recorded at fair value at the date of the transaction. To the extent that the related parties are affiliates under common control, the controlling reporting entity shall defer the effects of such transactions that result in gains or increases in surplus (*see* paragraph 13);

[b] Non-economic transactions between reporting entities, which meet the definitions of related parties above, shall be recorded at the lower of existing book values or fair values at the date of the transaction;

[c] Non-economic transactions between a reporting entity and an entity that has no significant ongoing operations other than to hold assets that are primarily for the direct or indirect benefit or use of the reporting entity or its affiliates, shall be recorded at the fair value at the date of the transaction; however, to the extent that the transaction results in a gain, that gain shall be deferred until such time as permanence can be verified;

[d] *Transactions which are designed to avoid statutory accounting practices shall be reported as if the reporting entity continued to own the assets or to be obligated for a liability directly instead of through a subsidiary*.

SSAP 25, ¶¶ 1, 9, 12, 13, 15 & 16 (emphasis added).

180.    The Model Act also addresses transactions with affiliates and prohibits self-interested transactions with affiliates:

> (A) Transactions within an insurance holding company system to which an insurer subject to registration is a party shall be subject to the following standards:
>
> > (1) The terms shall be fair and reasonable.

(2) Charges or fees for services performed shall be reasonable.

(3) Expenses incurred and payment received shall be allocated to the insurer in conformity with customary insurance accounting practices that are consistently applied.

(4) The books, accounts, and records of each party shall be so maintained as to clearly and accurately disclose the precise nature and details of the transactions including such accounting information as is necessary to support the reasonableness of the charges or fees to the respective parties.

(5) The insurer's surplus as regards policyholders following any dividends or distributions to shareholder affiliates shall be reasonable in relation to the insurer's outstanding liabilities and adequate to its financial needs.

Ohio Rev. Code Ann. § 3901.34.

### F.    Captives And Offshore Affiliates Help Companies Break The Rules

181.    While SSAP 25 clearly prohibits the use of affiliated transactions to manipulate a company's financial picture and give the appearance of stability and strength, it still relies on insurance companies to accurately disclose and report their financials.

182.    Companies that are motivated to cheat have found a perfect vehicle for financial alchemy in domestic and offshore captive subsidiaries and affiliates.  Because the captives' finances are largely secret and not subject to the same regulations, parent insurance companies can, and do, hide liabilities through affiliated transactions.

183.    Life insurance companies are now using captive SPFCs to misuse reinsurance and coinsurance as methods of masking their troubled financial condition.

184.    They do this by causing their affiliates to enter into what appears to be reinsurance or coinsurance transactions, but that are in reality simply means of shuffling the insurance company's worst liabilities and assets off its books.  In reality, however, liabilities are

not transferred because they never left the holding company system or the insurance company where it started.

**F.    Affiliated Transactions Help Hide Liabilities.**

185.    A company that wishes to disguise its troubled financial condition can hide some of its liabilities through affiliated transactions, allowing it to report positive surplus and RBC ratios.

186.    By creating captive reinsurers and offshore affiliated entities, life insurers can enter into non-economic, non-arm's-length transactions in which the ceding company can "cede" more liabilities than the assuming company reports it "assumes," or the ceding company can "send" significantly liabilities, while sending insufficient assets to cover these liabilities.

187.    Because surplus is a component of the insurance company's RBC ratio (it is part of the denominator in the RBC ratio calculation), artificially inflating surplus also artificially inflates RBC.

188.    In a normal arm's-length reinsurance transaction, an independent reinsurance company would not assume liabilities without also receiving real assets to cover those liabilities. Because life insurance involves such predicable risk factors, as compared to other forms of insurance, the actuary working for the ceding company will independently arrive at a number that should reasonably track the number arrived at by the assuming company's actuary.

189.    If the ceding actuary arrives at $2 Billion, for example, the assuming actuary should be in the same ballpark, substantially "mirroring" his counterpart.  Because different and independent executives and actuaries are involved in arm's-length reinsurance transactions, there is no great concern if the liability to asset ratio is minimally different because it simply reflects the subtle differences in each companies' management and actuarial approach.  Such a

43

transaction could, for example, look like this:



190.    When, however, the ceding company chooses to "cede" the $2 billion to an affiliated company (or wholly owned captive), no independent actuary calculations occur. Because the ceding parent and assuming captive share management and actuaries, the amount ceded and the amount assumed should be ***exactly*** the same.

191.    If the terms of the transaction can be concealed, however, there is a powerful incentive for the assuming affiliated company to set its reserves much lower.  Specifically, and as seen with USFL's reinsurance with AXA's captive affiliate AXA Arizona (discussed herein *infra* Section III(B)), such a transaction could look like this:



192.    In this example, the difference is neither subtle nor reasonable.  The two parties are not independent; instead, the same management is intentionally creating the disparity, which gives the appearance that $3.2 Billion in surplus for the ceding company resulted from the

reinsurance deal. Such manufacturing of phony surplus can be accomplished only because the captive does not file public financial statements revealing the lack of mirroring.

193.    The Model Holding Company Act expressly prohibits this sort of "reserve discounting" scheme. In the insurance industry it is called "window dressing." The Act mandates that when a ceding company transacts with an affiliate, the deal terms must be fair and reasonable; one party cannot benefit to the other party's detriment. If such transactions were permitted, no regulator, rating agency, or life insurance purchaser could possibly know the true condition of the ceding insurer.

194.    Through such affiliated reinsurance transactions, insurers generate false surplus by sending significant liabilities and likewise decreasing reserves, all the while sending far fewer assets than necessary to establish the assuming company reserves. Because the reinsurer is often an offshore entity or wholly owned domestic captive without regulated finances, the acquiring entity has no corresponding obligation to certify that its reserves meet statutorily mandated levels, or are adequate to cover the transferred liabilities. In short, the offshore affiliate or wholly owned captive is not subject to the same reserve scrutiny by regulators.

195.    By transferring reserve liabilities off a company's books, and onto an affiliate's books through sham or non-arm's-length "reinsurance" transactions, the "ceding" company is able to significantly reduce the cash reserves it is required to hold to pay future claims, thereby improving the company's risk profile in the process. This, of course, allows the company's surplus and capital picture to appear much healthier than it actually is, permitting stockholder dividend payouts while, at the same time, lulling policyholders into a false sense of security.

III.    **USFL's Captive Insurance Scheme**

196.    As discussed more fully below, since as early as 2004, AXA and USFL, and its

subsidiaries have engaged in numerous sham reinsurance transactions with the sole purpose of raiding cash reserves from USFL. To that point, the sham reinsurance transactions allowed USFL and AXA to misrepresent their financial health by hiding liabilities and inflating assets, thereby improving their risk profile and reducing the amount of cash reserves they were required to maintain.

197.     AXA RE Arizona Company is one of AXA Equitable Financial Services, LLC's ("AXA Equitable") wholly owned captive reinsurers, reinsuring USFL's life insurance liabilities. AXA Arizona and USFL are both wholly owned by and share the same immediate parent company, AXA Equitable. AXA Arizona has been organized under the laws of Arizona since 2012, with its principal place of business at 322 West Roosevelt, Phoenix, Arizona 85003. AXA Arizona was formerly domesticated in Bermuda.

### B.     Captive Reinsurance Scheme Weakens USFL

198.     Following the NAIC's adoption of Regulation XXX, USFL was now required to increase its policy reserve liabilities to levels much higher than in previous years. As discussed above, the entire purpose of Regulation XXX was to inject more conservatism into the reserving methodologies to better protect policyholders.

199.     Choosing to disregard NAIC's concerns for policyholders, USFL began, as early as 2004, engaging in a series of "captive reinsurance" schemes to sidestep these higher reserve requirements imposed by Regulation XXX. The captive scheme began in 2004 when AXA took control of USFL. That first year, 2004, USFL took reserve credit for reinsurance transferred to AXA Arizona for $491 Million. By 2016, it had snowballed to $870 Million, more than 8 times total reported surplus.

200.    In 2003, AXA Equitable (USFL's immediate parent) created the foreign special purpose financial captive reinsurer, AXA Financial (Bermuda) Ltd. ("AXA Bermuda" now known as AXA Arizona).  In 2004, USFL began ceding large amounts of life insurance business to AXA Bermuda in an attempt to sidestep the increased reserves Regulation XXX required it to hold.  Because USFL "ceded" these liabilities to AXA Bermuda, as of 2016 USFL reports a "reserve credit" of $813 million. In simplified terms, USFL "reduced" its reported policy liabilities by $813 million, thereby reducing the amount of assets it needed to hold to match the policy liabilities.

201.    To be allowed to recognize that $813 million reserve credit, traditional standards of statutory accounting require USFL to send to AXA Bermuda assets commensurate with the policy liabilities ceded.  However, USFL's own financial records indicate that $225 million of the "assets" used by USFL's affiliate AXA Bermuda (now known as AXA Arizona) was a "Letter of Credit."

202.    From the captive scheme's inception in 2004, USFL's total reserve credits nearly doubled in amount, from $490 million to $870 million.  The graph below represents the growth of USFL's reserve credit taken from inception to 2016.  The graph is based upon information that was taken directly from USFL's sworn statutory annual statements, Schedule S - Part 3 for those respective years.



203.    At the core of fundamental strength for large life insurance companies is the quality and breadth of its reinsurance portfolio.  Independent and well-capitalized reinsurers help life insurers spread risk.   However, shockingly, USFL placed $870 million with its OWN CAPTIVE while only placing $50 million with independent reinsurers as shown below:

| | Reserve Credit | |
|---|---|---|
| AXA Re AZ - Captive | $ | 812,835,248 |
| Other Reinsurers | $ | 50,245,517 |
| | $ | 863,080,765 |



204.    It is difficult to explain the sheer magnitude of USFL's "reinsurance" abuse.  The "reinsurance" transactions are imprudent and have no legitimate business purpose.

205.     To put this in perspective, USFL reported only $105 million in Total Surplus for 2016.  However, USFL has significantly "reduced" its policy liabilities through $860 million of affiliated captive reinsurance, which equals approximately 800% of reported surplus.

206.     What USFL has done is simply illogical– shoving its liabilities onto affiliated and undercapitalized captives.

207.     All 50 states incorporated the NAIC Model Holding Company Act into their insurance statutes.  Specific to these affiliated transactions, those statutes require, as previously stated, the following:

> (A) Transactions within an insurance holding company system to which an insurer subject to registration is a party shall be subject to the following standards:
>
>> (1) The terms shall be fair and reasonable.
>>
>> (2) Charges or fees for services performed shall be reasonable.
>>
>> (3) Expenses incurred and payment received shall be allocated to the insurer in conformity with customary insurance accounting practices that are consistently applied.
>>
>> (4) The books, accounts, and records of each party shall be so maintained as to clearly and accurately disclose the precise nature and details of the transactions including such accounting information as is necessary to support the reasonableness of the charges or fees to the respective parties.
>>
>> (5) The insurer's surplus as regards policyholders following any dividends or distributions to shareholder affiliates shall be reasonable in relation to the insurer's outstanding liabilities and adequate to its financial needs.

Ohio Rev. Code Ann. § 3901.34.

208.     The manner in which USFL effected and reported its transactions with affiliated captives failed to comply with *all* of the following standards:

- Transferring policy liabilities to **their captives** does not qualify as risk transfer sufficient to support the related reserve credits;

- Transferring policy liabilities to **their captives** without transferring commensurate admitted assets cannot qualify as "fair and **reasonable**;"

- Because the captives (both onshore and offshore) do not file statements with the NAIC and do not even make financial statements available to the public, none of the material transactions with the captives comply with the requirement that "the books, accounts and records . . . shall be so maintained as to clearly and accurately disclose the nature and details of the transactions . . .;"

- Because USFL does not transfer admitted assets commensurate with the policy liabilities, the transactions are deemed "window dressing." If such lopsided transactions were permitted, no one would ever be able to determine the insurer's true financial condition;

- Because USFL has not actually shed the policy liabilities, they are, in essence, reinsuring themselves, a circular transaction;

- Although it can't be determined without access to discovery if USFL is actually "discounting" its policy liabilities in the captive jurisdiction, it has been reported that some life insurers have discounted the reserves both offshore and onshore;

- Because the captives (both onshore and offshore) do not file statements with the NAIC and do not even make financial statements available to the public, it cannot be determined if the captive is merely "fronting" for another reinsurer to whom the captive has retroceded the same business, through which that reinsurer merely retrocedes the same business back to a USFL affiliate, completing a different circular flow;

- USFL has failed to disclose in its Note 1 of the Notes to Financial Statements the fact that USFL has received, on its own balance sheet, very material benefits from sham transactions that are being booked at the captives' level.

209. The affiliated transactions used by USFL and its captive affiliates had a massive impact on USFL's finances, yet crucial aspects of the shell game AXA, AXA Financial Inc., Axa Exquitable, and USFL played with its captives and affiliated entities went undisclosed in the sworn financial statements USFL filed annually under penalty of perjury. The incomplete

disclosures by USFL paint a picture of "form" only that might appear proper on the surface.  But it is the *substance*—the true nature and details of the transaction—that is missing.

210.    Indeed, USFL's annual financial statements falsely portrayed a stable company with ample capital and assets on hand to meet its long-term obligations.

211.    USFL captive reinsurance has placed significant downward pressure on USFL's liquidity and benchmark ratios.  Simply put, USFL has downward pressure on solvency and liquidity.  Without any other options, USFL has decided to take that cash from policyholders through a fraudulent COI increase.

## CLASS ALLEGATIONS

212.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on their own behalf and as representatives of the following Class:

> All persons or entities who purchased, contributed to, participated in the purchase, or own the Nova and SuperNova UL policies at issue and who received coverage from those named insurance policies issued by USFL that experienced a cost of insurance increase beginning on their policy anniversary after August 31, 2015.

213.    The members of the Class are so numerous that joinder of all Class members in this action is impracticable.  Plaintiffs believe that there are thousands of members of the Class.

214.    There are questions of fact and law common to the class, including but not limited to the following:

a.    whether Defendant engaged in scheme to defraud Plaintiffs and the Class through misrepresentations regarding USFL's financial strength and by failing to disclose deviations from NAIC SSAP and the financial ramifications resulting from said deviations;

b.    whether the Plaintiffs' and Class members' policies described above were defective by virtue of their being underfunded;

c.      whether the Defendant knew that the Life Policies were underfunded at the time it marketed and sold the policies to Plaintiffs and Class members;

d.      whether the Defendant conspired to market and did market the Plaintiffs' and Class members' Policies for the purposes of defrauding members of the Class;

e.      the actual financial health of USFL after accounting for its proper financial valuation;

f.      the true economic justification for raising the cost of insurance under the Plaintiffs' and Class members' Policies;

g.      whether USFL failed to maintain statutorily required reserve amounts;

h.      whether USFL breached its contractual obligations to Plaintiffs and Class members by raising the cost of insurance for improper purposes;

i.      whether Defendant was unjustly enriched by its actions towards Plaintiffs and Class members;

j.      whether Defendant converted the premiums and policy values of Plaintiffs sand Class members;

k.      whether Defendant defrauded Plaintiffs through their communications, acts, and/or omissions;

l.      the extent of injuries sustained by members of the Class; and

m.      the appropriate type and/or measure of damages.

215.    Plaintiffs' claims are typical of the claims of all members of the Class because Plaintiffs and all members of the putative Class have been damaged by the same unlawful/improper uniform misconduct by the Defendant alleged herein.

216.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. In addition, Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex litigation, including class action litigation. Finally, the interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.

217.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that could result from individualized litigation.  Further, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Class action treatment will also permit the adjudication of relatively small claims by the Class members, as measured against the effort and expense required to individually litigate these complex claims against Defendant.

218.    Plaintiffs know of no difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

219.    The Class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure in that (1) the Class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the Class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the Class; (4) the Plaintiffs will fairly and adequately protect the interests of the Class; (5) individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts and increase the delay and expense to all parties and the court system from the issues raised by this

action; and (6) the questions of law or fact common to the Class members predominate over any questions affecting any individual members.

## COUNTS

## COUNT ONE

## BREACH OF CONTRACT

220.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 219 as if fully set forth herein.

221.    Plaintiffs entered into a contract with USFL when the life insurance policy at issue was purchased.

222.    Throughout the life of the life insurance policy, Plaintiffs paid to USFL all premiums and charges due under the policy as set forth at the time of execution of the policy, and Plaintiffs have performed all obligations and conditions under the policy.

223.    Under the life insurance policy, USFL owed and continues to owe duties and obligations to the Plaintiffs and Class members.  Among these duties is the duty to properly administer the policy consistent with the terms and obligations set forth within the life insurance policy.  This includes the duty to determine the correct monthly deduction from a policyholder's account, the duty to notify the policyholder in a timely manner whenever USFL believed a policy's COI expenses increased, and to refrain from increasing the COI except under very specific conditions.

224.    USFL materially breached the terms of the life insurance policy and its duties to Plaintiffs and Class members under the policy when it:

        a.    instituted unreasonable COI increases for purposes not authorized under the life insurance policy;

b.      failed to determine the correct monthly deduction from the life insurance policy's account in accordance with the policy's terms and conditions;

c.      failed to notify Plaintiffs as soon as USFL determined that its "expectations" for the life insurance policy was inaccurate and that the policy was not performing sufficiently and required an increase in COI;

d.      failed to determine in a reasonably timely manner that the life insurance policy was not charged the appropriate COI;

e.      failed to maintain adequate reserves in order to perform on its obligations under the policy.

225.   As a direct and proximate result of USFL's conduct, Plaintiffs and Class members have been damaged in an amount to be determined at trial.  The aforementioned damages include, but are not limited to, the diminished value in Plaintiffs' and Class members' life insurance policy; the improper increased cost of insurance premiums; and any damages suffered by Plaintiffs and Class members from not having the opportunity to pursue and secure alternatives to the diminished life insurance policy at issue that occurred due to their reliance on the representations of financial solubility of the life insurance policy by USFL.

## COUNT TWO

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

226.   Plaintiffs incorporate the allegations of Paragraphs 1 through and including 219 as if fully set forth herein.

227.   Plaintiffs entered into a contract with USFL when Mr. Yerger purchased the life insurance policy and subsequently transferred ownership to the Trust.

228.   Plaintiffs and Class members did all, or substantially all, of the significant things

that the contract required them to do; namely, throughout the life of the life insurance policy, Plaintiffs and Class members have paid to USFL all premiums and charges due under the policy as set forth at the time of execution of the policy, and Plaintiffs have performed all obligations and conditions under the policy.

229.    Under the life insurance policy, USFL owed and continues to owe duties and obligations to Plaintiffs and Class members.  Among these duties is the duty to properly administer the policy consistent with the terms and obligations set forth within the life insurance policy.  This includes the duty to determine the correct monthly deduction from a policyholder's account, the duty to notify policyholders in a timely manner whenever USFL believed a policy's COI expenses increased; and to refrain from increasing the COI except under very specific conditions.

230.    USFL materially breached the terms of the life insurance policy and its duties to Plaintiffs under the policy when it:

a.    instituted unreasonable COI increases for purposes not authorized under the life insurance policy;

b.    failed to determine the correct monthly deduction from the life insurance policy's accounts in accordance with the policy's terms and conditions;

c.    failed to notify Plaintiffs and Class members as soon as USFL determined that its "expectations" for the life insurance policy was inaccurate and that the policy was not performing sufficiently and required an increase in COI;

d.    failed to determine in a reasonably timely manner that the life insurance policy was not charged the appropriate COI;

         e.        failed to maintain adequate reserves to perform on its obligations under the policy;

         f.        failed to administer and/or maintain said policy consistent with USFL's duty of good faith and fair dealing implied in the performance of every contract.

231.    USFL's actions unfairly interfered with the Plaintiffs' and Class members' receipt of their policy's benefits.

232.    USFL's conduct did not comport with Plaintiffs' and Class members' reasonable contractual expectations under the policy with respect to potential COI increases.

233.    As a direct and proximate result of USFL's conduct, Plaintiffs and Class members have been damaged in an amount to be determined at trial. The aforementioned damages include, but are not limited to, the diminished value in Plaintiffs' and Class members' life insurance policies; the improper increased COI premiums; and any damages suffered by Plaintiffs and Class members from not having the opportunity to pursue and secure alternatives to the diminished life insurance policies at issue that occurred due to their reliance on the representations of financial solubility of the life insurance policy by USFL. Plaintiffs and Class members are entitled to restitution for all premiums paid or, in the alternative, the unlawful and artificially inflated COI charges that USFL has paid itself from the policiess cash value.

## **COUNT THREE**

### **UNJUST ENRICHMENT**

234.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 219 as if fully set forth herein.

235.    Plaintiffs and Class members conferred benefits upon USFL; specifically, paid money in the form of premiums to fund their life insurance policies.

236.    USFL knew that they were enjoying such benefits from the Plaintiffs' and Class members' premium and excess premium payments.

237.    USFL misused the benefits Plaintiffs and Class members conferred on them by engaging in the above described schemes.

238.    USFL chose not to inform Plaintiffs and Class members that USFL's "expectations" for the subject universal life insurance policies were not being met as soon as they knew such information, causing Plaintiffs and Class members to continue to make premium and excess premium payments to the Plaintiffs' and Class members' detriment.

239.    USFL has unlawfully raided Plaintiffs' and Class members' cash value accounts under the guise of a justified contractually mandated increase in COI.

240.    USFL's actions have caused policyholders to abandon their universal life insurance policies without receiving the benefit of said policies.

241.    USFL's actions have caused policyholders to rely on false statements USFL has made and, as a result, permit USFL to raid their policies' cash value.

242.    It is unjust for USFL to retain the benefits they have enjoyed from Plaintiffs' and Class members premium payments and excess premium payments.

243.    As a direct and proximate result of USFL's conduct, Plaintiffs and members of the putative Class have been damaged in an amount to be determined at trial.   The aforementioned damages include, but are not limited to, the diminished value in Plaintiffs' and the members of the Class' life insurance policies; the improper increased COI premiums; and any damages suffered by Plaintiffs and members of the Class from not having the opportunity to

pursue and secure alternatives to the diminished life insurance policies at issue that occurred due to their reliance on the representations of financial solubility of the life insurance policies by USFL. Plaintiffs and the members of the putative Class are entitled to restitution for all premiums paid or, in the alternative, the unlawful and artificially inflated COI charges that USFL has paid itself from the policies' cash value.

## COUNT FOUR

## CONVERSION

244.     Plaintiffs incorporate the allegations of Paragraphs 1 through and including 219 as if fully set forth herein.

245.     On and before their 2015 policy anniversary, Plaintiffs and Class members had acquired significant cash values as part of their universal life insurance policies.

246.     Plaintiffs' and Class members' policy cash values were specific and identifiable, and were the Plaintiff's and Class members' personal property.

247.     Beginning on their policy anniversary after August 31, 2015, and continuing every month thereafter, USFL caused money to be withdrawn from the Plaintiffs' and Class members' cash value accounts and deposited into USFL and/or AXA accounts.

248.     In so doing, USFL has exerted ownership and dominion over the Plaintiffs' and Class members' personal property in denial of the Plaintiffs' and Class members' rights.

249.     As a direct and proximate result of USFL's conduct, Plaintiffs and members of the putative Class have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment:

A.     Certifying the Class as requested herein;

B.      Awarding Plaintiffs and Class members compensatory damages in an amount to be determined at trial;

C.      Awarding Plaintiffs and Class members restitution damages in an amount to be determined at trial;

D.      Punitive Damages;

E.      Awarding Plaintiffs declaratory and injunctive relief;

F.      Awarding Plaintiffs and Class members attorneys' fees and costs; and

G.      Affording Plaintiffs and Class members with such further and other relief as deemed just and proper by the Court.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues triable by right by jury.

RESPECTFULLY SUBMITTED, this the 19th day of June, 2017.


/s/Todd B. Naylor
**GOLDENBERG SCHNEIDER, L.P.A.**
JEFFREY S. GOLDENBERG (0063771)
TODD B. NAYLOR (0068388)
One West Fourth Street, 18th Floor
Cincinnati, Ohio 45202-3604
Tel: 513.345.8291
Fax: 513.345.8294
JGoldenberg@gs-legal.com
TNaylor@gs-legal.com

**BEASLEY, ALLEN, CROW, METHVIN,**
**PORTIS & MILES, P.C.**
W. DANIEL "DEE" MILES, III (*pro hac vice anticipated*)
ANDREW E. BRASHIER (*pro hac vice anticipated*)
RACHEL N. BOYD (*pro hac vice anticipated*)
272 Commerce Street
Post Office Box 4160 (36103)
Montgomery, Alabama 36104
Telephone: 334-269-2343
Facsimile: 334-954-7555
dee.miles@beasleyallen.com
andrew.brashier@beasleyallen.com
rachel.boyd@beasleyallen.com

**GEOFF McDONALD & ASSOCIATES, P.C.**
GEOFFREY R. McDONALD (*pro hac vice anticipated*)
JUSTIN M. SHELDON (*pro hac vice anticipated*)
FRANK H. HUPFL, III (*pro hac vice anticipated*)
3315 West Broad Street
Richmond, Virginia 23230
Telephone: 804-888-8888
Facsimile: 804-359-5426
gmcdonald@mcdonaldinjurylaw.com
jsheldon@mcdonaldinjurylaw.com
fhupfl@mcdonaldinjurylaw.com


*Counsel for Plaintiffs and Putative Class*