# EXHIBIT 2

```
                                                            Page 1
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE SOUTHERN DISTRICT OF OHIO
 3                     WESTERN DIVISION
 4
 5      CASE NUMBER:  1:17-cv-417
 6
 7      VIVIAN FARRIS,
 8              Plaintiff,
 9      vs.
10      U.S. FINANCIAL LIFE
11      INSURANCE COMPANY,
12              Defendants.
13
14
15
16
17
18
19
20
21
22           TELECONFERENCE VIDEO DEPOSITION
23                         OF
24                 TIMOTHY C. PFEIFER
25                 December 11, 2020
```

Page 2

1  REPORTED BY:
2       Jan A. Mann, CSR
3       Veritext Legal Solutions
4       260 North Joachim Street
5       Mobile, Alabama 36603
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1       STIPULATIONS
2
3       IT IS STIPULATED AND AGREED by and between the
4  parties through their respective counsel, that the
5  deposition of TIMOTHY C. PFEIFER may be taken before Jan
6  A. Mann, Commissioner, by teleconference on the 11th day
7  of December, 2020.
8       IT IS FURTHER STIPULATED AND AGREED that the
9  signature to and the reading of the deposition by the
10 witness is not waived.
11      IT IS FURTHER STIPULATED AND AGREED that it
12 shall not be necessary for any objections except as to
13 form or leading questions, and that counsel for the
14 parties may make objections and assign grounds at the
15 time of the trial, or at the time said deposition is
16 offered in evidence or prior thereto.
17      IT IS FURTHER STIPULATED AND AGREED that the
18 notice of filing of the deposition by the Commissioner
19 is waived.
20
21
22
23
24
25

Page 4

1       A P P E A R A N C E S
2
3   APPEARING ON BEHALF OF THE PLAINTIFF
4   (via teleconference):
5       BEASLEY ALLEN LAW FIRM
6       Mr. Paul Evans
7       Ms. Rachel N. Boyd
8       Mr. Dee Miles
9       218 Commerce Street
10      Montgomery, Alabama  36104
11
12  APPEARING ON BEHALF OF THE DEFENDANT
13  (via teleconference):
14      MCDOWELL HETHERINGTON, LLP
15      Mr. David McDowell
16      Mr. Will Thomas
17      1001 Fannin Street
18      Houston, Texas  77002
19
20
21  ALSO PRESENT (via teleconference):
22      Renato Velarde, Videographer
23      Hector Geribon
24
25

Page 5

1       I N D E X
2
3  EXAMINATION BY:                    PAGE
4  Mr. Evans                           7
5  Mr. McDowell                      188
6           INDEX OF EXHIBITS
7  PLAINTIFF'S EXHIBITS
8  Exhibit 2   Policy                 102
9  Exhibit 17  2015 Memorandum        138
10 Exhibit 23  NGE Police & Implementation Process 127
11 Exhibit 38
12 Exhibit 43  USFL 001842            139
13 Exhibit 68  USFL 132939-2014 NGE Statement    169
14 Exhibit 101 Stern Report           103
15 Exhibit 104 ASOP 2                  70
16 Exhibit 113 Pfeifer's Report        10
17 Exhibit 114 Invoice                 39
18 Exhibit 115 First Exposure Draft    65
19 Exhibit 116 Task Force Comments     66
20 Exhibit 117 2nd Exposure Draft of ASOP 2    73
21 Exhibit 118 Task Force Comments     76
22 Exhibit 119 Article                 84
23 Exhibit 120 Article                 87
24 Exhibit 121 Slides                  95
25 Exhibit 122 Interrogatory Reponses 173

2 (Pages 2 - 5)

Page 126

1 Q. In 2007 when they determined COI rate
2 increase, they would have made the COI increase to
3 attempt to restore profitability, right?
4 A. I'm not sure that I saw any evidence
5 specifically to that point, and even if they did, it's
6 irrelevant in terms of the approach taken in 2015.
7 Q. So is it your opinion that any PVFP
8 projections that were performed in 2007 are irrelevant
9 to the 2015 COI analysis?
10  MR. MCDOWELL: Objection. Asked and
11 answered.
12 A. To the extent that the company
13 reflected the COI increase that occurred in 2007,
14 which they did in the CBE stream of PVFP, that
15 established a new CBE and it's my opinion that that
16 then needs to be compared as per the redetermination
17 standard against original profitability.
18 Q. So is it your opinion that USFL correctly
19 chose the original pricing assumptions as baseline
20 instead of the 2007 assumptions because of the
21 determination policy?
22 A. That coupled with the fact that the
23 company did reflect in the CBE profit stream that the
24 CBE profitability was positively impacted by virtue of
25 the 2007 COI increase.

Page 127

1 Q. How were you able to determine that the
2 CBE profit streams reflected the 2007 increases?
3 A. That, I know, was part of a discussion
4 with Mr. Luber. There may have been some other -- I
5 think that was in some of the deposition transcripts
6 as well.
7 Q. All right. Then if we go back to the
8 first part of paragraph 77, were there any documents
9 that you reviewed where USFL defined baseline
10 assumptions as the CBE assumptions with the exception of
11 mortality?
12 A. My recollection was that that was
13 indicated in Mr. Luber's memo in March of 2015
14 describing the methodology.
15 Q. Was that understanding derived from
16 anywhere else other than that 2015 memorandum?
17 A. I believe deposition testimony as well.
18  (Whereupon, Plaintiff's
19  Exhibit 23 was previously marked
20  for identification.)
21 Q. All right. I'm now going to pull up
22 Exhibit 23 which is the NGE policy and implementation
23 process. Have you reviewed this document?
24 A. Could you page down to make sure I'm
25 familiar with the whole document?

Page 128

1 Q. Sure. And although you can't see it
2 here, that says Exhibit 23.
3 A. Okay. I believe you.
4 Q. Does this document look familiar?
5 A. It does look familiar to me.
6 Q. Okay. And then on page USFL 132951, this
7 NGE policy details two different approaches for
8 assessing NGE's. Is that right?
9 A. Two different possible approaches,
10 correct.
11 Q. All right. And one approach is the
12 component approach. Is that right?
13 A. That's correct.
14 Q. And then the other approach is the
15 integrated approach?
16 A. That is true.
17 Q. All right. And then in your report in
18 paragraph 102, you write in the first sentence that
19 Mr. Stern goes on to claim that Mr. Luber stated that
20 USFL used the integrated approach in developing the 2015
21 COI increases. Did I read that right?
22 A. Yes.
23 Q. All right. Do you dispute that USFL used
24 the integrated approach for its 2015 COI increase
25 analysis?

Page 129

1 A. It's my opinion that the approach used
2 in the 2015 COI change analysis was the component
3 approach.
4 Q. And what's your basis for that opinion?
5 A. I'd like to go back, if you don't mind,
6 back to the September 2014 redetermination document
7 that you just showed me.
8 Q. Sure.
9 A. So if --
10 Q. Is this -- okay.
11 A. ==My opinion is based upon the==
12 ==description of the component approach and the==
13 ==integrated approach. These are two approaches that==
14 ==have been defined by USFL. These are not standard==
15 ==terminology and have standard meaning in the industry.==
16 ==So I derived my opinion based upon these definitions.==
17  ==And the definition of the component==
18 ==approach is a focus on one non-guaranteed element and==
19 ==associated assumptions that match up with that==
20 ==non-guaranteed element and that is indeed what -- what==
21 ==the approach that USFL took. They looked at COI==
22 ==rates. They looked at one experience assumption by==
23 ==itself being mortality, essentially paired the two==
24 ==things up and held everything else constant, and to==
25 ==me, that's the definition of the component approach.==

| Page 162 | Page 164 |
|---|---|
| 1  wrong, but you said that USFL did different mortalities | 1  and projects future events in its assumptions, would the |
| 2  using different assumptions for expected mortality. Is | 2  actuary need to document where it used those future |
| 3  that right? | 3  events to form the assumptions? |
| 4     A.   I think I testified that I have seen | 4     A.   I think it would -- it would be, you |
| 5  evidence of several different mortality analyses that | 5  know, relatively common if an actuary used assumptions |
| 6  took different approaches to the analysis. | 6  that were not necessarily based on experience to |
| 7     Q.   Do you recall what those other approaches | 7  indicate at least in a general way what the basis for |
| 8  were? | 8  those assumptions were. |
| 9     A.   Just in terms of different expected | 9     Q.   All right. And then you mentioned some |
| 10 tables, different assumed cohorts that went into the | 10 examples you gave. You gave an example of the AIDS |
| 11 actual mortality data, those kind of variations. | 11 epidemic, right? |
| 12    Q.   Why -- do you know why USFL took those | 12    A.   Correct. |
| 13 other approaches? | 13    Q.   So an actuary creating mortality |
| 14    A.   Well, like most insurance companies, I | 14 assumptions could look to AIDS to anticipate higher |
| 15 think there is an ongoing interest in mortality | 15 mortality in the future even though that insurer has not |
| 16 experience and questions arise from management as to | 16 experienced an increase in claims due to AIDS. Is that |
| 17 different ways to look at the data and understand it. | 17 a fair way to put it? |
| 18 So it's not unusual for a company to have looked at | 18    A.   I think -- I think you're generally |
| 19 mortality experience under a variety of different | 19 correct. I guess I would be a little more specific |
| 20 approaches and regimes. | 20 and say this is not a hypothetical scenario. This is |
| 21    Q.   And then if we go to your report at | 21 in fact what happened when the AIDS epidemic, you |
| 22 paragraph 120, is it correct to characterize that | 22 know, hit the world that insurance companies |
| 23 paragraph as opining that actuaries can develop future | 23 anticipated a rise in mortality before that rise in |
| 24 assumptions that are untethered to past experience. Is | 24 mortality occurred and began making mortality |
| 25 that right? | 25 assumptions that reflected that presumption of higher |

| Page 163 | Page 165 |
|---|---|
| 1     A.   May I ask you to state the question | 1  mortality. |
| 2  again? | 2     Q.   When USFL was creating its CBE's for |
| 3     Q.   Sure. In paragraph 120, is it fair to | 3  mortality -- CBE mortality assumptions, did its |
| 4  characterize that paragraph as saying that actuaries can | 4  actuaries identify the AIDS epidemic as affecting its |
| 5  develop future assumptions that are untethered to past | 5  future assumptions of mortality? |
| 6  experience? | 6     A.   I didn't see any documentation |
| 7     A.   I think paragraph 120 is saying that | 7  concerning consideration of AIDS specifically. |
| 8  there are circumstances where an actuary, in | 8     Q.   Okay. And then the second example you |
| 9  considering anticipated future experience, will rely | 9  gave was the COVID pandemic, right? |
| 10 on other elements beyond simply past experience and | 10    A.   Correct. |
| 11 may give more emphasis or more weight to anticipated | 11    Q.   And then USFL could not have identified |
| 12 future events than the past and I try to cite a few | 12 COVID as affecting its future mortality assumptions |
| 13 examples of that in my report. | 13 because obviously COVID hadn't happened in 2015, |
| 14    Q.   So what you're saying is, is that past | 14 thankfully? Is that right? |
| 15 experience can inform future assumptions but future | 15    A.   Was there a question in there? |
| 16 assumptions aren't always solely based on past | 16    Q.   Yeah. I mean they couldn't have |
| 17 experience. Is that right? | 17 predicted COVID when forming their mortality assumptions |
| 18    A.   I think that's a great way to put it | 18 in 2015, right? |
| 19 and you said it probably better than I said it in my | 19    A.   I don't think anybody in 2015 had the |
| 20 report but I think the key point is that an actuary is | 20 belief that a worldwide pandemic was around the corner |
| 21 expected to be a thinker and anticipator and to use | 21 so that's a correct statement. |
| 22 their background to project future events and not rely | 22    Q.   ==All right. So in developing its CBE== |
| 23 completely on the rearview mirror look of what has | 23 ==mortality assumptions, did USFL identify any reason that== |
| 24 happened. | 24 ==it anticipated higher mortality experience that had not== |
| 25    Q.   If an actuary goes beyond past experience | 25 ==yet emerged?== |

Veritext Legal Solutions
877-373-3660                                              800.808.4958

| | Page 166 | | Page 168 |
|---|---|---|---|
| 1 | A. I believe that the primary driver of | 1 | the pricing assumptions to determine if those |
| 2 | USFL's mortality assumption was a review of experience | 2 | assumptions were reasonable in the first place? |
| 3 | and past experience with the anticipation that that | 3 | A. It really is generally not part of a |
| 4 | poor experience on the mortality side was likely to | 4 | COI redetermination exercise from an actuarial |
| 5 | continue. | 5 | perspective. I'm not saying that it hasn't happened |
| 6 | Q. But you can't think of any factors as you | 6 | in some COI cases where that analysis has been done |
| 7 | sit here today that contributed to their future | 7 | but an actuary involved in COI redetermination I think |
| 8 | mortality experience assumptions other than past | 8 | has other priorities than to, you know, second guess |
| 9 | experience? | 9 | what the original pricing mortality or any assumption |
| 10 | A. I think past experience in this case | 10 | might have been. |
| 11 | was the primary driver. | 11 | Q. Are you aware of insurers that did review |
| 12 | Q. All right. And when a universal life | 12 | their pricing assumptions to determine if they were |
| 13 | product experiences adverse mortality relative to | 13 | reasonable during a COI redetermination? |
| 14 | pricing, do actuaries generally try to determine the | 14 | A. I can't think of any. That may be |
| 15 | cause of that adverse mortality experience? | 15 | something that would generally occur before I am |
| 16 | A. It depends on the nature of the | 16 | engaged in an analysis so I can't think of any |
| 17 | deviation from expected mortality. It depends on the | 17 | company, no. |
| 18 | role that the actuary is playing with respect to the | 18 | Q. So it's possible that a company that sees |
| 19 | COI change. It may be something that is part of an | 19 | that its experience -- it's having poor experience, that |
| 20 | actuarial -- an actuary's role but not always. | 20 | it might look to their pricing assumptions to see if |
| 21 | Q. In the situations where actuaries did | 21 | those had reasonable assumptions. Is that fair? |
| 22 | attempt to determine a cause of adverse mortality | 22 | A. I think your question is, is it |
| 23 | experience, how would an actuary do that? | 23 | possible? Yes, it's certain possible. |
| 24 | A. It would likely involve a review of | 24 | Q. Would that a good practice to do or |
| 25 | death claims at maybe a more granular level, | 25 | would -- |
| | Page 167 | | Page 169 |
| 1 | understanding causes of death, patterns in the death | 1 | A. It may be in some cases time that's not |
| 2 | claims, perhaps speaking to claims personnel within | 2 | well spent because it may not change really the job |
| 3 | the company or the underwriting personnel. There | 3 | that needs to be done from the standpoint of changing |
| 4 | could be a number of sources of that information. | 4 | non-guaranteed elements. |
| 5 | Q. Would that include looking to how the | 5 | Q. Okay. But in other cases, it could be a |
| 6 | policies were underwritten? | 6 | good starting point. It just depends is what you're |
| 7 | A. I think I mentioned that. | 7 | saying? |
| 8 | Q. Okay. Are you aware if UFLA reviewed its | 8 | A. I don't think there's a universal |
| 9 | death claims at a granular level to determine the cause | 9 | answer to that question. |
| 10 | of its adverse expected mortality? | 10 | Q. Okay. |
| 11 | A. That was really beyond my scope. I | 11 | MR. EVANS: All right. Is it all right |
| 12 | didn't -- I didn't pursue that question. | 12 | if we take a short break? |
| 13 | Q. All right. And then in paragraph 92 of | 13 | MR. MCDOWELL: You bet. |
| 14 | your report, you say that regardless of whether the | 14 | MR. EVANS: All right. |
| 15 | original pricing mortality assumption was believed to be | 15 | THE VIDEOGRAPHER: The time is now four |
| 16 | too optimistic by Mr. Stern, it is not customary for an | 16 | p.m. we're going off the record. |
| 17 | actuary developing redetermination assumptions to change | 17 | (Brief recess.) |
| 18 | the original pricing assumptions baseline simply because | 18 | THE VIDEOGRAPHER: The time is now 4:12 |
| 19 | they believe that the original assumption was too | 19 | p.m. We're back on the record. |
| 20 | optimistic or pessimistic. The original pricing | 20 | (Whereupon, Plaintiff's |
| 21 | baseline is based on the original pricing baseline. Did | 21 | Exhibit 68 was previously marked |
| 22 | I read that correct? | 22 | for identification.) |
| 23 | A. You did. | 23 | Q. (BY MR. EVANS:) All right. Mr. Pfeifer, |
| 24 | Q. All right. So is it your opinion that | 24 | I'm going to pull up Exhibit 68 which is USFL 132939 and |
| 25 | actuaries during a COI redetermination should not review | 25 | this is USFL's 2014 NGE statement. And then if you look |

Veritext Legal Solutions
877-373-3660 800.808.4958

```
                                                        Page 190
 1                C E R T I F I C A T E
 2
 3
 4       STATE OF ALABAMA)
 5       MOBILE COUNTY)
 6
 7           I hereby certify that the above
 8   proceedings were taken down by me and transcribed by me
 9   and that the above is a true and correct transcript of
10   the said proceedings given by said witness.
11           I further certify that I am neither of
12   counsel nor of kin to the parties nor in anywise
13   financially interested in the outcome of this case.
14
15
16
17                  [signature: Jan A. Mann]
18
19                  JAN A. MANN
20                  COMMISSIONER - NOTARY PUBLIC
21                  ACCR NO. 321
22
23
24
25
```

```
                                                        Page 191
 1   To: David McDowell, Esq.
 2   Re: Signature of Deponent Timothy C. Pfeifer
 3   Date Errata due back at our offices: 1/21/2021
 4
 5   Greetings:
 6   This deposition has been requested for read and sign by
     the deponent.  It is the deponent's responsibility to
 7   review the transcript, noting any changes or corrections
     on the attached PDF Errata.  The deponent may fill
 8   out the Errata electronically or print and fill out
     manually.
 9
10   Once the Errata is signed by the deponent and notarized,
     please mail it to the offices of Veritext (below).
11
12   When the signed Errata is returned to us, we will seal
     and forward to the taking attorney to file with the
13   original transcript.  We will also send copies of the
     Errata to all ordering parties.
14
15   If the signed Errata is not returned within the time
     above, the original transcript may be filed with the
16   court without the signature of the deponent.
17
18   Please Email the completed errata/witness cert page
     to readandsign@veritext.com
19   or mail to
20   Veritext Production Facility
21   2031 Shady Crest Drive
22   Hoover, AL 35216
23   205-397-2397
24
25
```

```
                                                        Page 192
 1   ERRATA for ASSIGNMENT #4356937
 2   I, the undersigned, do hereby certify that I have read the
     transcript of my testimony, and that
 3
 4   ___ There are no changes noted.
 5   ___ The following changes are noted:
 6
     Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
 7   (2017). Rule 30(e) states any changes in form or
     substance which you desire to make to your testimony shall
 8   be entered upon the deposition with a statement of the
     reasons given for making them.  To assist you in making any
 9   such corrections, please use the form below.  If additional
     pages are necessary, please furnish same and attach.
10
11   Page _____ Line _____ Change _____
12   _____
13   Reason for change _____
14   Page _____ Line _____ Change _____
15   _____
16   Reason for change _____
17   Page _____ Line _____ Change _____
18   _____
19   Reason for change _____
20   Page _____ Line _____ Change _____
21   _____
22   Reason for change _____
23   Page _____ Line _____ Change _____
24
25
```

```
                                                        Page 193
 1   Page _____ Line _____ Change _____
 2   _____
 3   Reason for change _____
 4   Page _____ Line _____ Change _____
 5   _____
 6   Reason for change _____
 7   Page _____ Line _____ Change _____
 8   _____
 9   Reason for change _____
10   Page _____ Line _____ Change _____
11   _____
12   Reason for change _____
13   Page _____ Line _____ Change _____
14   _____
15   Reason for change _____
16
17
18           _____
                    DEPONENT'S SIGNATURE
19
     Sworn to and subscribed before me this ___ day of
20
         _____, _____.
21
22   _____
23   NOTARY PUBLIC / My Commission Expires:_____
24
25
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.